**WESTERN BEEF, INC.,**
**Plaintiff-Appellee,**

v.

**COMPTON INVESTMENT CO. et al.,**
**Defendants-Appellants.**

No. 77–1510.

United States Court of Appeals, Fifth Circuit.

Feb. 11, 1980.

Rehearing Denied April 8, 1980.

Gerald S. Rourke, Joel R. Weinstein, Washington, D. C., for defendants-appellants.

Wayne P. Sturdivant, John T. Huffaker, Amarillo, Tex., for plaintiff-appellee.

Before GEWIN, AINSWORTH and REAVLEY, Circuit Judges.

GEWIN, Circuit Judge:

Compton Investment Company and Roebuck Investment Company (C&R) appeal from a judgment of the District Court for the Northern District of Texas, awarding Western Beef, Inc. (Western) $7,111.19 against Compton and $10,860.27 against Roebuck and granting no relief to C&R on their large counterclaims brought against

Western under several theories. The trial court, without a jury, determined that Western did not breach the cattle feeding agreements it had with C&R in any material respect and owed no damages to C&R.[1] The damages awarded to Western were, in large part, amounts determined by the trial court to be Western's share of profits in the venture after the court deducted all costs claimed by Western. We affirm in part, reverse in part, and remand for recomputation of damages and accounting fees.

Western Beef, Inc., a vertically integrated beef producing company, is the parent corporation of several corporate subsidiaries and a grain purchasing division. The subsidiaries relevant to this appeal include three feedlots (Union County Feedlot, Inc., Clayton, New Mexico; Cal-Tex Feed Yard, Inc., Trent, Texas; Dumas Cattle Feeders, Inc., Dumas, Texas), a cattle purchasing company (Clifton Cattle Company), and a cattle slaughtering and meat packing plant (Sunray Meats, Inc.). Western's integral grain purchasing division is Western Beef Grain Company which had at one time been a corporate subsidiary but, in the fall of 1971, was no longer a separate legal entity.

Western's *raison d'etre* was primarily to furnish tax deferral advantages for its investors.[2] There is evidence that while apparently not all of C&R's principals had this objective foremost in their minds upon entering the investment agreements, it may have been a motivating factor for some of them. The tax ramifications of the plan were in no way mentioned in the agreements, however.

Prior to the formation of the contracts, the Washington, D.C. law firm of Trammel, Rand, Nathan and Bayles, general partner in both Compton and Roebuck, sent Mr. William Barr, employee of the firm, to visit Western Beef and learn about the cattle feeding investment business. Barr was shown the feed and cattle facilities and given some promotional material by Western's senior vice-president. The promotional material described the Western Beef group as if it were a single company and did not mention the individual incorporation of its wholly owned subsidiaries.

Negotiations ensued toward the formation of cattle feeding agreements between C&R and Western. The agreements as ultimately signed provided for C&R to invest a large sum of money in cattle and feed. Western was to purchase grain for C&R, feed the actual grain purchased to cattle purchased for C&R, and sell the cattle for C&R's account when they reached slaughter weight. A relatively stable inventory of cattle were to be fed for both Compton and Roebuck with monthly sales being replenished by new purchases.

The dispute in this case concerns several provisions of the feeding agreements which C&R claim were breached by Western. The contracts provided certain warranties that the price paid for feed and cattle would not exceed the average price per hundred weight paid by Western's most favored customer or by Western itself for feed purchased for its own account. In regard to feed, the amount paid was not to exceed the actual cost of all feed actually consumed by C&R's cattle and this amount only was specified as the allowable feed deduction from gross receipts to determine profits under the agreements. The deduction allowed for cattle costs consisted of the purchase price, related freight charges and standard commission expenses. Western was to maintain records and underlying documents sufficient to permit accurate computation of all amounts required to be computed for purposes of the agreements. The contracts also included a provision allowing C&R to deduct from gross receipts reasonable accounting fees incurred to insure Western's compliance with the terms

---

1. *Western Beef, Inc. v. Compton Investment Co., et al.*, No. CA–2–1453 (N.D.Tex. Feb. 10, 1977).

2. The crux of Western's tax deferral plan was to offset current income in one year through large expenditures for pre-purchased grain to be fed to cattle owned by the taxpayer in the succeeding tax year. By deducting the amount of the grain purchases as a loss in the first year, tax advantages could be attained because of the deferral of income into the future.

of the agreements and to permit verification of the amount of profits or losses. Finally the contracts included a nondelegation and assignment clause specifically forbidding Western from delegating its duties or assigning its rights under the contract.

Many of the facts of the case are disputed. Western claims it overcharged C&R in no respect while C&R claim overcharges ranging from the purchase of inferior cattle at premium prices to sale of the cattle below market price to Western's subsidiary packing plant. C&R's claims rest primarily on the theory, however, that the subsidiaries and the grain division were bound by the contracts between C&R and Western and any margin of profit included for these other corporate defendants was an overcharge resulting in too large a deduction from C&R's gross profits. For this reason the determination of whether there has been a material breach of the feeding agreements by Western resulting in damages to C&R turns on the relationship between the parties and in particular, the obligation, if any, owed to C&R by Western's wholly owned subsidiaries and its grain division.

At the outset it must be noted that based on its findings of facts the trial court held that Western's subsidiaries were not bound by the contracts and Western breached the contracts in no material respect.[3]

■ The court's findings of fact are entitled to be affirmed unless they are clearly erroneous. F.R.Civ.P. 52(a). *See Horton v. U.S. Steel Corp.,* 286 F.2d 710, 713 (5th Cir. 1961) ("[f]indings . . . come here well armed with the buckler and shield of F.R. Civ.P. 52(a)"). Appellate courts are, of course, especially reluctant to set aside a finding based on the trial court's evaluation of conflicting oral testimony. *See King v. Gulf Oil Co.,* 581 F.2d 1184, 1186 (5th Cir. 1978).

■ In this case the trial court determined the intention of the parties entering these contracts by evaluating the testimony given at trial. The finding that the parties did not intend to bind the corporate subsidiaries to perform is supportable by substantial evidence and is not clearly erroneous even though this court may not have made the same finding when presented with this record. To the extent that this finding of fact is not clearly erroneous it must be affirmed.

■ The trial court's treatment of Western Beef Grain Company deserves a closer look, however. Western Beef Grain, unlike the subsidiary corporate defendants, is not a separate legal entity wholly apart from its owner, Western Beef, Inc. It is simply a division of Western Beef. Yet in its findings of fact, *see* note 3 *supra,* the trial court gave no effect to this legal distinction. The court did recognize the fact that Western Beef Grain was a division of Western Beef, Inc. The problem is not the court's factual finding with respect to Western Beef Grain, the problem is the legal effect that the lower court gave to that finding. It is axiomatic that the scope of review of the legal effect given to accepted facts is much broader than the clearly erroneous standard. *See In the Matter of Lee,* 570 F.2d 1301, 1302 n.1 (5th Cir. 1978); *First National Bank of Miami v. Insurance Company of*

---

**3.** The trial court made the following finding of fact:

> The contracts in question obligate only Western Beef, Inc. and none of the wholly owned corporate defendants of Western were named as parties to the contract. It was not the intention of the parties, either on the face of the contract or otherwise, to bind the other corporate defendants. Compton and Roebuck were aware that the costs to be incurred by Western for the account of Compton and Roebuck in the performance of each of these feeding programs would include profits and charges made by the corporate cross-defendants in this case even though they were wholly owned by Western. The inclusion of such charges and profits as well as the other costs were properly charged by Western to the account of Compton and Roebuck.

*Western Beef, Inc. v. Compton Investment Co., et al.,* No. CA–2–1453 (N.D.Tex. Feb. 10, 1977), Finding of Fact 76. While this finding may be generally correct, it fails to recognize the significant distinction between Western's subsidiaries and its division, Western Beef Grain Company, which has no separate legal existence.

*North America,* 495 F.2d 519 (5th Cir. 1974) *app. after remand,* 535 F.2d 284 (5th Cir. 1976); 9 Wright and Miller, Federal Practice and Procedure: Civil §§ 2588, 2589.

■ Regardless of the standard of review, however, the court's finding that the corporate defendants other than Western Beef, Inc. are not bound to the contracts, insofar as it applies to Western Beef Grain Company is erroneous as a matter of law. We agree with the recent pronouncement of the Third Circuit in *In re Sugar Industry Antitrust Litigation (Stotter and Co., Inc. v. Amstar Corp. et al.),* 579 F.2d 13 (3d Cir. 1978). "A division of a corporation is not a separate legal entity but is the corporation itself." *Id.* at 18.

■ Western Beef Grain had been a separate legal entity until the summer of 1971 when it was merged into Western as a division. It thereby lost any claim of separateness from Western. For Western to claim that Western Beef Grain's profits are not limited to compensation due to Western under the contracts is to claim an independent existence for the division that it does not have.

The findings of the trial court refer in several instances to Western negotiating and contracting with Western Beef Grain on behalf of C&R for the purchase of grain and the court states that the price adopted to be charged C&R in the negotiations between Western and Western Beef Grain were related to prevailing market prices.[4] There could be no clearer breach of the explicit terms of the feeding agreements. Those agreements provide for feeder Western (which would include Western Beef Grain) to acquire grain necessary for C&R's cattle and to charge C&R for the "actual cost" of feed consumed by those cattle. In the court's findings it is clearly stated that Western's employees set a price to be charged to C&R which had no relation to the amount ultimately paid by Western Beef Grain for grain fed to C&R's cattle. To the extent that Western's "adopted" price for the grain pre-purchased for C&R was higher than the actual amount paid by Western Beef Grain for the grain actually consumed by C&R's cattle, Western Beef Grain made an undue profit. There is also extensive evidence that the freight charges "adopted" to be charged C&R were not actually incurred in the amounts charged. Any excess in freight charged over freight charges incurred is also undue profit to Western Beef Grain.

This court is aware of course that Western contends that the entire feeding program was tax-motivated and that the procedure used, including the pre-purchase of grain for use in a subsequent year, was essential to achieve the tax goals of the program. Western contends that the fact that Western Beef Grain was able to subsequently purchase grain at a lower price (which was actually fed to C&R's cattle) is of no consequence. For the tax deferral program to work, it is argued, C&R had to be charged for the grain purchased in the year previous to the time when the cattle were to be fed.

The contracts are totally silent on any tax-related purposes of the program or even on any pre-purchase of grain. They do provide unambiguously, however, that Western was to charge C&R the "actual cost" of feed consumed by C&R's cattle. The trial court went beyond the language of the contracts and determined that grain was pre-purchased by Western Beef Grain to accomplish the targeted tax deferral.[5]

4. *Western Beef, Inc. v. Compton Investment Co., et al.,* No. CA–2–1453 (N.D.Tex. Feb. 10, 1977), Finding of Fact 63.

5. Regarding the parties' intention, the trial court found as follows:
   The parties to the feeding Agreement understood and intended that the amount of grain pre-purchased would be contingent on the target tax deferral of the principals in Compton Investment Company and Roebuck Investment Company. The parties further contemplated that in reaching the target tax deferral, feed bills and interest paid prior to December 31, 1971 would be deductible and would contribute to the target deferral.
   *Western Beef, Inc. v. Compton Investment Co., et al.,* No. CA–2–1453 (N.D.Tex. Feb. 10, 1977), Finding of Fact 48.

■ When interpreting contracts courts are compelled to determine and give effect to the intentions of the parties. *Chadwick v. Esperanza Trade and Transport, Ltd.,* 548 F.2d 1161 (5th Cir. 1977). A recent decision of this court states the test for determining the intention of the parties. "The language of the contract, unless ambiguous, represents the intention of the parties. The intent deduced from this objective matter, not the parties' subjective understandings, is controlling." *Kimbell Foods, Inc. v. Republic Nat. Bank,* 557 F.2d 491, 496 (5th Cir. 1977), *reh. denied,* 564 F.2d 97, *cert. granted, U. S. v. Kimbell Foods, Inc.,* 436 U.S. 903, 98 S.Ct. 2230, 56 L.Ed.2d 400 (1978), *affirmed,* 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979). *See Western Oil Fields, Inc. v. Pennzoil United, Inc.,* 421 F.2d 387, 390 (5th Cir. 1970); *City of Pinehurst v. Spooner Addition Water Co.,* 432 S.W.2d 515, 518 (Tex.1968).

■ The language of this contract regarding feeding procedures is clear. Despite the understandings submitted to the court the unambiguous language of the contract directs that the actual feed purchased for C&R's cattle was to be fed to them and it is this feed for which C&R was to be charged. While this procedure may not meet the requirements of the alleged tax-deferral program, it does give effect to the unambiguous and controlling language of these feeding agreements. Because Western Beef Grain Company, as a division of Western Beef must be considered to be a party to these agreements, the trial court on remand must determine any profits that Western Beef Grain derived from charging C&R for grain other than that actually consumed by C&R's cattle, including freight charges other than those actually incurred. Any such profits were not proper and must be awarded as damages to C&R.

■ C&R also claim reasonable accounting fees under Paragraph 14(a)(x) of the feeding agreements [6] in the amount of $20,500, incurred in connection with C&R's effort to determine Western's compliance with the terms of the agreement prior to filing this lawsuit, and in excess of $250,000 in the course of this litigation. The trial court did not include C&R's accounting fees as a deduction from gross receipts in its calculation of profit as required by the contracts and in fact only summarily addressed the issue in denying fees of any accountants employed by C&R. Such reasonable fees were among the items listed, however, that "shall" be deducted in computing profits and losses. C&R were entitled to such a deduction for reasonable accounting fees and the court erred in failing to determine what fees were reasonable in this case. On remand the trial court should determine the reasonableness of accounting fees incurred by C&R and deduct them from gross receipts as required by the contracts.

For the reasons stated the judgment of the district is affirmed in part, reversed in part and remanded for the assessment of damages and accountants' fees.

**AFFIRMED IN PART, REVERSED IN PART AND REMANDED.**

---

**6.** Section 14(a)(x) of the feeding agreements read as follows:

14(a) The profits or losses shall be determined and computed by deducting from the amount of the net proceeds realized at the time Owner's cattle are sold, the total amount of the following costs and expenses:

\* \* \* \* \* \*

(x) reasonable expense of Owner's accounting fees incurred to insure feeder's compliance with the terms and conditions of this Agreement, and to permit computation and verification of the amount of profits earned and/or losses suffered in connection with this Agreement.