690 F.2d 1343
 SEABOARD COAST LINE RAILROAD COMPANY, formerly Seaboard Air
Line Railroad Company, a Virginia Corporation,
Plaintiff-Appellant,
v.
TRAILER TRAIN COMPANY, a/k/a Trailer Train, Inc., a Delaware
Corporation, Defendant-Appellee.
 No. 81-5568.
 United States Court of Appeals,
Eleventh Circuit.
 Nov. 8, 1982.
 
 Grissett, Humphries & Kellogg, Peter J. Kellogg, Homer H. Humphries, Jr., Jacksonville, Fla., for plaintiff-appellant.
 Martin, Ade, Birchfield & Johnson, Stephen H. Durant, Jacksonville, Fla., Hopkins & Sutter, Michael M. Conway, Chicago, Ill., for defendant-appellee.
 Appeal from the United States District Court for the Middle District of Florida.
 Before KRAVITCH and HENDERSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.
 KRAVITCH, Circuit Judge:
 
 
 1
 This appeal presents two questions concerning arbitration: whether the arbitration clause of a contract is applicable to the dispute involved, and whether the order denying arbitration is appealable as a final judgment. We hold that we have jurisdiction to consider the appeal[1] but conclude that arbitration is not required. Hence we affirm.
 
 I.
 
 2
 The Trailer Train Company "Trailer Train" was incorporated in 1955 by the nation's railroads for the purpose of maintaining a pool of railroad flat cars to meet the member railroads' needs. Members borrow cars from the pool under a "Form A Car Contract" (the "Car Contract"). The Car Contract, which establishes a license to use the cars, and not a lease, provides for the payment by a member railroad to Trailer Train of a per diem charge, plus a mileage rate where applicable, for every car provided. Seaboard Coast Line Railroad Company ("Seaboard") is one of the member railroad companies having an ownership interest in Trailer Train. Seaboard entered into a Car Contract with Trailer Train in 1959.
 
 
 3
 The arbitration clause at issue is part of the Car Contract. The clause provides, in pertinent part, "(a)ny difference or dispute arising hereunder which cannot be settled by agreement between Carrier and Trailer Train shall be submitted to two arbitrators ...." Car Contract, P 18. Also relevant to the dispute is the preamble of the Contract, which provides:
 
 
 4
 WHEREAS, Trailer Train owns or leases a pool of railroad flat cars, bearing the mark "TTX" for identification and being of varying lengths or categories as indicated in the Appendices hereto, which are equipped for the movement of highway trailers by rail; and
 
 
 5
 WHEREAS, Carrier is a stockholder of Trailer Train and is desirous of participating, together with others, in the use of said cars of Trailer Train; and
 
 
 6
 WHEREAS, Trailer Train and Carrier desire to enter into an agreement with respect to the furnishing by Trailer Train to Carrier of said cars for the movement of highway trailers (which for the purposes of this agreement shall include demountable containers used in lieu of highway trailers) on the lines of railroad now or hereafter operated by Carrier; ...
 
 
 7
 (emphasis added). Paragraph 16 of the Contract further establishes that Trailer Train is to provide freight cars at the lowest possible cost to the member railroads. Finally, paragraph 17 explicitly states "No title, leasehold, or property interest of any kind in cars furnished hereunder shall vest in (Seaboard) ..., by reason of this agreement or by reason of the delivery to or use by (Seaboard) of the cars." (emphasis added).
 
 
 8
 The dispute before us arose out of the availability of an investment tax credit ("ITC") for railroad cars. In 1962 Congress enacted sections 46 and 48 of the Internal Revenue Code, permitting owners of certain property, such as Trailer Train, to take a dollar-for-dollar credit on their tax return for an amount equal to 7% of the purchase price of qualifying property. Owners also were permitted to pass through this credit (pass-through) to lessees of the qualifying property. Two pertinent documents were required in order for the lessee to qualify for the ITC: a formal lease agreement signed by the parties, and an "election" document filed with the IRS.
 
 
 9
 Trailer Train acquired some of its cars by lease and others by purchase: only the latter cars qualified for the ITC. By resolution of its Board of Directors, Trailer Train for the first time in 1965 authorized the pass-through of the ITC to a member railroad, the Norfolk and Western Railroad. A committee of the Board was authorized to approve the terms of a written lease between Trailer Train and the railroad. Under established terms an investment tax credit lease was executed, and the appropriate election documents issued. Consequently, Trailer Train's available ITC on the railroad cars was passed through for use as a tax credit by Norfolk and Western.
 
 
 10
 Between 1965 and 1970 the Board of Directors of Trailer Train authorized pass-through of investment tax credits to 16 different member railroads, utilizing the same procedure used between Trailer Train and Norfolk and Western. Further, each individual authorization approved pass-through for a specified number of railroad cars: although the member was not obligated to lease as many cars as were authorized, they logically could not lease more than the authorized number. Pass-through was authorized for a total of 6,902 cars, but leases were executed for only 5,354 cars.
 
 
 11
 Under the typical lease arrangement between Trailer Train and a member company the rental is applied against any per diem charges accrued over the course of a year under the Car Contract. The lessee railroads simply relinquish the leased cars to Trailer Train to be placed in the pool of available cars; the member railroads then pay per diem charges on cars they borrow from the pool, setting off the per diem against rent on leased cars.[2]
 
 
 12
 Prior to the July 1969 meeting of Trailer Train's Board of Directors the Comptroller of Trailer Train sent a telegram to the member railroads, including Seaboard, indicating that cars ordered by the railroads in 1968 and 1969 could qualify for the investment tax credit pass-through, providing the credit had not already been taken on the cars and that two additional conditions were met:
 
 
 13
 (1) Election for accepting such credit must be made prior to filing your tax return for the year such cars were delivered. Therefore, if you are interested you should avail yourselves of not filing such return before making said election, and (2) A formal lease arrangement covering such cars must be made between Trailer Train and member company. (emphasis added).[3]
 
 
 14
 Seaboard responded to the telegram, indicating that it was interested in executing formal leases to obtain the pass-through credit[4], and at the July 25, 1969 meeting Trailer Train's Board authorized pass-through to Seaboard for 756 cars. Thereafter, five leases and election forms were sent to Seaboard and properly executed. These leases covered 465 cars, identified by number, ordered by Seaboard in 1968. Seaboard never received documents, however, for the cars ordered in 1969. Nevertheless, relying on the telegram stating that the credit was available, and on alleged assurances[5] that the necessary forms were forthcoming, Seaboard claimed the credit for 1969 cars on its 1969 return. In 1973, when the IRS audited Seaboard's 1969 return it disallowed the credit of $769,134.00 because the election forms were not appended.[6]
 
 
 15
 On February 17, 1981 Seaboard filed suit against Trailer Train, alleging breach of contract in failing to provide the documentation necessary for the pass-through. In the same complaint Seaboard asked the district court to stay the suit and compel arbitration under the arbitration clause in the Car Contract. Trailer Train responded, filing a motion for summary judgment. The district court denied Seaboard's motion to compel arbitration and ordered Seaboard to respond to the summary judgment motion. Before us is the question whether the district court properly denied arbitration under the arbitration clause of the Form A Car Contract.
 
 II.
 
 16
 We begin our analysis by noting the federal policy favoring arbitration over litigation, 9 U.S.C. § 1 et seq. (Federal Arbitration Act); Ultracashmere House, Ltd. v. Meyer, 664 F.2d 1176, 1179-80 (11th Cir. 1981); Seaboard Coast Line Railroad Co. v. National Rail Passenger Corp., 554 F.2d 657, 660 (5th Cir. 1977)[7]; J. S. & H. Construction Co. v. Richmond County Hospital Authority, 473 F.2d 212, 214-15 (5th Cir. 1973). This federal policy requires that we construe arbitration clauses generously, resolving all doubts in favor of arbitration. United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 583, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409, 1418 (1960); Local Union No. 4-449, Oil, Chemical and Atomic Workers Union, AFL-CIO v. Amoco Chemical Corp., 589 F.2d 162, 163 (5th Cir. 1979); National Railroad Passenger Corp. v. Chesapeake & Ohio Railroad Co., 551 F.2d 136, 140 (7th Cir. 1977).
 
 
 17
 Nevertheless, the question of whether a contract's arbitration clause requires arbitration of a given dispute remains a matter of contract interpretation. Atkinson v. Sinclair Refining Co., 370 U.S. 238, 242, 82 S.Ct. 1318, 1321, 8 L.Ed.2d 462, 466 (1962); Par-Knit Mills, Inc. v. Stockbridge Fabrics Company, Ltd., 636 F.2d 51, 54 (3d Cir. 1980); Totem Marine Tug & Barge, Inc. v. North American Towing, Inc., 607 F.2d 649, 651 (5th Cir. 1979). Such a determination rests on the intent of the parties. See Par-Knit Mills, Inc., supra, 636 F.2d at 54-55 (arbitration predicated on agreement of parties to arbitrate); Local Union No. 4-449, supra, 589 F.2d at 163-64 (when no ambiguity as to intent of parties, no doubt to be resolved). A party may not be required to arbitrate a dispute it did not agree to arbitrate; Atkinson v. Sinclair Refining Co., supra, 370 U.S. at 242, 82 S.Ct. at 1321, 8 L.Ed.2d at 466; Andrew Martin Marine Corp. v. Stork-Werkspoor Diesel B. V., 480 F.Supp. 1270, 1275 (E.D.La.1979), "(i)f the contract does not (provide for arbitration), then no Federal law requires arbitration," Commercial Metals Co. v. Balfour, Guthrie, & Company, Ltd., 577 F.2d 264, 266 (5th Cir. 1978).
 
 
 18
 The district court in this case determined that the present dispute does not fall within the arbitration clause of the Car Contract. A determination by a trial court of what was intended by the parties in their agreement is a question of fact, not to be disturbed by this court unless clearly erroneous.[8] Rule 52(a), Fed.R.Civ.P.; Western Beef, Inc. v. Compton Investment Co., 611 F.2d 587, 591 (5th Cir. 1980) (to the extent finding of trial court as to intent of parties not clearly erroneous, this finding must be affirmed); Zapata Marine Service v. O/Y Finnlines, Ltd., 571 F.2d 208, 209 (5th Cir. 1978) (upholding as not clearly erroneous district court's determination of the forum agreed to by parties). When, as here, the district court reaches its determinations solely on the basis of depositions, affidavits, and documents, the burden of establishing clear error is not so heavy, and the clearly erroneous rule is somewhat ameliorated, Green v. Russell County, 603 F.2d 571, 573-74 (5th Cir. 1979); McKensie v. Sea Land Service, Inc., 551 F.2d 91, 92 (5th Cir. 1977), "(n)evertheless, where the conclusions of the trial judge may reasonably be inferred from the record, such conclusions should not be disturbed on appeal ... even though conflicting inferences of equal reasonableness may be drawn from a review of the same body of evidence." Id. (quoting Skidmore v. Grueninger, 506 F.2d 716, 724 (5th Cir. 1975)). Therefore, we proceed under the clearly erroneous standard, albeit "ameliorated."
 
 
 19
 In addition to finding that Seaboard's claim does not arise under the Car Contract, and "accordingly, the claim does not fall within the arbitration provision of the .... Car Contract," the district court also found that Trailer Train did not agree to arbitrate the claims asserted by Seaboard in this action, and that in all the other instances where Trailer Train agreed to pass-through investment tax credits to railroads, that pass-through was embodied in contracts "separate and distinct from the Form A Car Contract."
 
 
 20
 Appellant contends that the trial court erred in failing to place the dispute concerning the lease and election documents within the ambit of the Car Contract's arbitration clause. In support of its claim appellant pieces together various bits of the Car Contract to show that the Contract is an "umbrella" or "general" contract governing all future dealings between the parties, and that any other contract, such as the ITC lease contract, is subsidiary to the Car Contract and governed by its terms. Seaboard argues that the preamble to the Car Contract mentions Trailer Train "furnishing" cars to member railroads, that the contract requires Trailer Train to do so at the lowest possible cost, that the contract is explicitly subject to all Federal laws, insofar as they "affect, change or modify" the terms of the agreement, and finally, that the contract contains an arbitration clause, which by its own terms governs "all disputes" concerning furnishing of cars. Under this framework, Seaboard contends, the 1962 passage of the Investment Tax Credit legislation was a change in Federal law "affecting" the "furnishing" of cars at the lowest possible rate, and the dispute before us, concerning the "furnishing" of cars under an ITC lease, falls within the "all disputes" arbitration clause.
 
 
 21
 In presenting this argument Seaboard relies upon Consumer Concepts, Inc. v. Mego Corp., 458 F.Supp. 543 (S.D.N.Y.1978). In Consumer Concepts both parties agreed that there was an "umbrella" contract under which all further subsidiary agreements were incorporated as "Items." Id. at 543-44. The only issue was whether a dispute, arising out of a working agreement governing negotiations that never reached fruition in an "Item," was covered under the umbrella agreement. Id. at 545. The court held that because fruitful negotiations would have led to an incorporated Item under the umbrella contract, a working agreement established to protect the parties should negotiations not bear fruit would also fall under the general terms of an umbrella contract that detailed the relationship between the parties.
 
 
 22
 This case is quite different. The Car Contract does not profess to cover all present and future aspects of the relationship between Trailer Train and its member railroads. It is a contract of limited application, governing only the day-to-day supply of railroad flat cars in return for which Trailer Train received a per diem rate. The only possible evidence to the contrary is language in the preamble that speaks of "furnishing" Trailer Train's cars to member railroads. Read broadly, "furnishing" might refer to any means of furnishing, including ITC leases. The language of the preamble, however, cannot be read in isolation; the preamble explains why the parties entered into a per diem contract, and once read in context can mean nothing more. The contract is devoid of any language suggesting that it is a general, or "umbrella" document entered into prior to developing a variety of different "furnishing" schemes.
 
 
 23
 Appellant also relies upon Hilti, Inc. v. Oldach, 392 F.2d 368 (1st Cir. 1968), to explain why the Car Contract should govern a transaction not authorized by Congress until six years after the contract was developed, and three years after it was signed by Seaboard. In Hilti the parties entered into a dealership contract containing an arbitration clause, which stated that "(a) ny controversy or claim arising out of or relating to the breach" of the contract "shall be settled by arbitration ...." Id. at 372-73. Subsequent to the contract's formation Puerto Rico passed a law affecting termination of dealerships. When Hilti terminated its dealership, Oldach sued, alleging a claim under the Puerto Rico law. Oldach objected to Hilti's attempt to arbitrate arguing that the Puerto Rico law passed after the contract was entered into was not foreseeable by the parties, and hence was not arbitrable under the contract. The court disagreed, noting that the contract broadly stated that "any controversy" concerning breach of the contract was arbitrable, and that the claim based upon the new statute clearly fell within this very broad language. Id. at 373.
 
 
 24
 Unlike Hilti, however, our concern is not the breadth of the arbitration clause, but the breadth of the Car Contract. Although the arbitration clause is broad, it is applicable only to disputes arising under the Car Contract, which governs provision of railroad cars at a per diem rate, and nothing more.[9]
 
 
 25
 More persuasive than either Consumer Concepts or Hilti is the case of Necchi v. Necchi Sewing Machine Sales Corp., 348 F.2d 693 (2d Cir. 1965). In Necchi the arbitration clause in the distributorship contract provided that "(a)ll matters, disputes or disagreements arising out of or in connection with this Agreement shall be finally settled" by arbitration. Id. at 695. When appellant failed to renew the Sales Corp.'s distributorship the Sales Corp. submitted a list of matters it wished arbitrated. The district court found the "broad scope" of the arbitration clause prevented it from making an initial determination whether the nine listed matters arose "out of or in connection with" the agreement, id. at 696, and ordered the matters submitted to arbitration.
 
 
 26
 The Court of Appeals reversed, noting that "(t)he arbitration provision here is broad, but not that broad." Id. Stressing that an order to arbitrate under the Federal Arbitration Act is "simply an order granting specific performance of an arbitration provision," the Second Circuit held that it is the duty of the reviewing court to determine the breadth of the clause, and whether the dispute at hand falls within that breadth. Id. at 696-97.
 
 
 27
 The Court then proceeded to evaluate those matters the Sales Corp. wished arbitrated, concluding "there is no basis for maintaining that the matters referred to in items 1, 2, 3, 6, 7 and 9 arise out of or in connection with the agreement." Id. at 697. Addressing one particular claim, the Court of Appeals stated: "The matter referred to in item 7 has been governed by a contract entered into by Necchi and the Sales Corp. in 1958, and that contract, one without an arbitration provision, has remained distinct and separate from the ... distributorship ... agreement...." Id. The same is true here: the district court found ITC matters outside the scope of the Car Contract and embodied in separate and distinct lease agreements.
 
 
 28
 Seaboard seeks to distinguish Necchi on the grounds that here the ITC dispute does fall within the arbitration clause because ITC leasing involves "two major subjects" of the Car Contract-furnishing cars, and doing so at terms financially beneficial to member railroads. We find the following language from Necchi particularly responsive to Seaboard's argument:
 
 
 29
 It is undoubtedly true that many of the matters referred to in items 1, 2, 3, 6, 7 and 9 would not have arisen if the exclusive distributorship arrangement had never existed between the Sales Corp. and Necchi. But this is not sufficient to render them arbitrable within the specific meaning of the arbitration clause of the (distributorship) agreement, which requires that the matter arise out of or in connection with that agreement rather than the working relationship between the parties.
 
 
 30
 Id. at 698. Similarly, although the ITC dispute may never have arisen but for the prior per diem arrangement, the fact is that the Car Contract is limited in scope and its arbitration clause does not encompass this "distinct and separate" dispute between the parties, which has no support in the provisions of the Car Contract. Id. Therefore, the arbitration clause of the Car Contract does not apply.
 
 
 31
 Seaboard also relies on extrinsic evidence to prove that the Car Contract covers lease arrangements under §§ 46 and 48 of the Internal Revenue Code. It offers the telegram from the Comptroller of Trailer Train notifying member railroads of the opportunity to receive pass-through ITC. That telegram stated in part "Cars ordered by your railroad in 1968 and 1969 which are not now covered by an investment credit lease can qualify for your election to receive investment credit. Two conditions must be met ..." Seaboard argues that because the ITC was available for cars "ordered" under the Car Contract, the Car Contract must control any agreement concerning leasing. This argument also fails. The telegram itself explains that a new arrangement is required before pass-through ITC will be available, and is as easily read to offer an alternative arrangement, as a variation on a current one. The trial court found that ITC leasing required a separate arrangement, and its finding is amply supported by the evidence. Further, Seaboard was well aware that the ITC leases were part of a different arrangement, as evidenced by the fact that they signed five separate leases for the 1968 cars.
 
 
 32
 Seaboard further argues that Trailer Train itself treated the two different arrangements as one and the same, and offers as proof the affidavit of Mr. Albrecht of Trailer Train, in which he explains the relationship between billing under the two arrangements. This affidavit, contends Seaboard, is proof that the ITC leases were "geared to" the Car Contract. The quoted portion of the affidavit[10] offers no such proof, however. It merely explains the necessary adjustment whereby the amounts paid under the Car Contract were used to set off amounts due under the leases.[11]
 
 
 33
 Seaboard's final argument is that because the Car Contract's arbitration clause would apply to a failure to provide cars at all, it also must apply to a failure to supply forms necessary to leasing cars. This argument is based on a misunderstanding of the issue here. What is at issue is not whether the cars were ordered or delivered, but under which contract the delivery was to take place. Seaboard is correct that if cars ordered under the Car Contract were not delivered it would have recourse to arbitration. Likewise, if cars for which ITC leases were executed were not delivered[12] the terms of the ITC lease would apply. But the two contracts were separate and distinct, and the terms of one contract cannot control breach of another.[13]
 
 III.
 
 34
 Although Federal policy requires us to resolve any doubt about the application of an arbitration clause in favor of arbitration, United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. at 583, 80 S.Ct. at 1353, 4 L.Ed.2d at 1418; Local Union No. 4-449, Oil, Chemical and Atomic Workers Union, AFL-CIO, 589 F.2d at 163, the Federal policy cannot serve to stretch a contract beyond the scope originally intended by the parties. Atkinson v. Sinclair Refining Co., 370 U.S. at 242, 82 S.Ct. at 1321, 8 L.Ed.2d at 466; Necchi, supra, 348 F.2d at 696-97. Here, the trial court found the Car Contract inapplicable to any other arrangements. Our review indicates the trial court was not clearly erroneous in so finding, and in declining to order arbitration.[14] The judgment of the district court is therefore AFFIRMED.
 
 
 
 [1]
 Trailer Train contends on appeal that the court is without jurisdiction to hear this cause on the ground that a denial of a motion to compel arbitration is not a final order within the meaning of 28 U.S.C. § 1291, nor is it an appealable interlocutory order under 28 U.S.C. § 1292(a)(1). Appellee first raised this contention prior to oral argument, filing with the court a Motion to Dismiss the Appeal and a Supporting Memorandum of Law. A panel of this court denied appellee's motion without opinion. We again reject the contention that we are without jurisdiction; the Fifth Circuit held in La Nacional Platanera v. North American Fruit & Steamship Corp., 84 F.2d 881, 882 (5th Cir. 1936) that a denial of a motion to compel arbitration is "a final judgment and appealable." See also City of Naples v. Prepakt Concrete Co., 494 F.2d 511, 512-13 (5th Cir. 1974) (reiterating holding of La Nacional ). Decisions of the Fifth Circuit prior to October 1, 1981 are binding on this court. Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1982) (en banc)
 
 
 [2]
 The ITC lease arrangements were made for tax purposes, and were incidental to Trailer Train's obligation to maintain a pool of railroad flat cars. The pool was comprised of cars from two sources. First, Trailer Train provided a supply of cars, which it either bought or leased from outside sources. Second, member railroads provided to the pool those cars they leased under ITC pass- through arrangements from Trailer Train. Obviously, this latter group was itself comprised of cars Trailer Train had bought, for which ITC pass-through was available
 The railroads then borrowed from the pool those cars they required. Borrowing took place under the Car Contract, which established a license to use the cars, but no leasehold interest. A per diem rate was paid on any borrowed cars.
 As to payment, Trailer Train determined charges due from each member company. First, Trailer Train would calculate the amount due under the ITC leases. Then, Trailer Train would calculate the per diem charges due. Finally, Trailer Train would apply against the per diem charges any charges under the leases. No member would have to pay both because theoretically a railroad would not require per diem cars if it had lease cars. Theory differed from reality, however, because leased cars could not be everywhere a railroad might have need for available flat cars. Therefore, the members relinquished the leased cars to the pool, and borrowed back from the pool, ensuring availability of cars to all members when and where they needed them. Then, to compensate for the leased cars relinquished to the pool, Trailer Train subtracted from the lease amounts due charges paid on cars borrowed on a per diem basis.
 
 
 [3]
 The full text of the telegram read:
 JUNE 25 1969
 SUBJECT: FOLLOW-UP OF PASSING ON INVESTMENT CREDIT TO MEMBER COMPANIES FOR 1968 AND 1969 CAR DELIVERIES.
 CARS ORDERED BY YOUR RAILROAD IN 1968 AND 1969 WHICH ARE NOT NOW COVERED BY AN INVESTMENT CREDIT LEASE CAN QUALIFY FOR YOUR ELECTION TO RECEIVE INVESTMENT CREDIT. TWO CONDITIONS MUST BE MET FOR TRAILER TRAIN TO PASS ON THIS CREDIT: (1) ELECTION FOR ACCEPTING SUCH CREDIT MUST BE MADE PRIOR TO FILING YOUR TAX RETURN FOR THE YEAR SUCH CARS WERE DELIVERED.
 THEREFORE, IF YOU ARE INTERESTED, YOU SHOULD AVAIL YOURSELVES OF NOT FILING SUCH RETURN BEFORE MAKING SAID ELECTION, AND (2) A FORMAL LEASE ARRANGEMENT COVERING SUCH CARS MUST BE MADE BETWEEN TRAILER TRAIN AND MEMBER COMPANY.
 IF YOUR COMPANY IS INTERESTED IN OBTAINING THE INVESTMENT CREDIT FOR 1968 AND 1969 DELIVERIES, YOU SHOULD CONTACT YOUR REPRESENTATIVE ON TRAILER TRAIN'S BOARD OF DIRECTORS OR FINANCE COMMITTEE AND HE SHOULD CONTACT IN WRITING MR. MERRILL HAINES, SECRETARY, TRAILER TRAIN COMPANY, IN ORDER TO HAVE THE REQUEST DOCKETED AT THE JULY, 1969 BOARD MEETING.
 J. A. BRENNAN, JR., COMPTROLLER TRAILER TRAIN CO.
 
 
 [4]
 Seaboard sent the following letter in response to Trailer Train's telegram:
 This has reference to Mr. Brennan's telegram of June 25, advising that Trailer Train cars ordered in 1968 and 1969 that were not covered by an investment credit lease could qualify for an investment credit if the Railroads involved elect to enter into a formal lease to cover these cars before filing their tax returns for the year such cars were delivered.
 Seaboard Coast Line is interested in obtaining the investment credit for our 1968 and 1969 deliveries, and I would appreciate your arranging to have this matter docketed for consideration at the July, 1969, Board meeting.
 Very truly yours,
 Original signed by
 J. R. THORNE
 
 
 [5]
 The record contains two references, in affidavits, to the reliance on promised documents. C. E. Crutchfield, Seaboard's Assistant Vice-President of Costs and Economics, states in his affidavit:
 I was notified on September 9, 1970 that (Seaboard's) tax return was due shortly and that the required supporting documents had not been received from Trailer Train. I telephoned Trailer Train Company on this date and was informed that the required documents would be send (sic) and that (Seaboard) should proceed to claim the (ITC) on its 1969 tax return.
 The affidavit of John K. Wylie, Director-Income Taxes of Seaboard states:
 Between 1973 and 1979 at least once or twice a year I had personal contact with Markel L. Albrecht, Director of Corporate Taxes, Trailer Train Company, while attending the Railroad Income Tax Administrators Conferences during those years. At all times, (Albrecht) assured me that he and Trailer Train Company were attempting to locate the proper documents and at no time during this period did (Albrecht) inform me or even hint that the proper documents could not be delivered by (Trailer Train).
 Not only do the affidavits allege assurance, they also show that Seaboard knew of, and understood the need for, the election documents. Nevertheless, it appears little effort was made to obtain the forms, other than a phone call, and several extra-official contacts.
 Further, the document that Seaboard used to establish its 1969 ITC included 310 "estimated-use" cars, for which Seaboard claimed the ITC although it could not have had the necessary information. In fact, inclusion of these "estimated use" cars led to a claimed ITC for over 300 more cars than Trailer Train authorized. Trailer Train authorized the credit for 756 total cars and Seaboard claimed the credit for 465 of the 1968 cars. This left only 291 available car credits, yet Seaboard claimed the credit for 615 cars in 1969.
 Although Seaboard might have arranged for a greater number of leases, the number of leased cars actually authorized by Trailer Train retains significance because Trailer Train could only pass-through ITC for cars it both had purchased from outside sources (as opposed to leased), and for which it had not previously claimed the ITC. Therefore, it was up to Trailer Train to monitor the status of cars in which it had an interest, and to distribute pass-through to member companies. The mechanism employed by Trailer Train was authorization, and therefore Seaboard could not possibly receive ITC for more cars than were authorized by Trailer Train.
 
 
 [6]
 Seaboard does not dispute knowledge of the necessary ITC documents. Moreover, the record includes the five detailed leases executed by Seaboard for the 1968 cars, as well as the election forms provided by Trailer Train. The record also includes the yearly reports sent to Seaboard from Trailer Train, detailing the status of all leased cars, and omitting any mention of the 1969 cars
 
 
 [7]
 In the en banc decision of Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981), the Eleventh Circuit adopted as precedent the decisions of the former Fifth Circuit
 
 
 [8]
 When intent of the parties plays a part in construction of a contract, the issue of intent is a question of fact. Valley Cement Industries, Inc. v. Midco Equipment Co., 570 F.2d 1241, 1242-43 (5th Cir. 1978). See also Thornton v. Bean Contracting Company, Inc., 592 F.2d 1287, 1290 (5th Cir. 1979) (holding contract construction a question of law, except where extrinsic evidence is concerned). The trial court's order in this case indicates that the court did more than examine and construe the contract. Considering the evidence, the court concluded not only that the arbitration clause in the Car Contract was inapplicable to the dispute about ITC documents, but also that the parties did not "agree" to arbitrate this dispute. We uphold the lower court's determination under the "ameliorated" clearly erroneous standard. Green v. Russell County, 603 F.2d 571, 573-74 (5th Cir. 1979)
 
 
 [9]
 The explicit language of the Car Contract is contrary to Seaboard's position. The Car Contract creates "(n)o title, leasehold, or property interest of any kind in cars furnished hereunder ...." Car Contract, P 17 (emphasis supplied). Seaboard seeks to avoid the "no ... leasehold" language, relying on paragraph 20 of the Car Contract, which makes the contract subject to "all Federal, ... laws, rules, regulations and ordinances which may now or hereafter affect, change or modify the terms or conditions herein or render unlawful the performance of any of the provisions of this agreement." Appellants argue that passage by Congress of the ITC provisions of the Internal Revenue Code rewrote the Car Contract to conform to rules for ITC pass-through. We reject this argument. The ITC provisions of the Internal Revenue Code are not self-implementing. They require documentation, and an entirely distinct agreement. The district court specifically found that when Trailer Train and a member railroad entered into ITC leases the transactions were covered by a separate and distinct agreement. We uphold that finding
 
 
 [10]
 The relevant portion of Mr. Albrecht's affidavit states:
 
 
 [6]
 The concept approved by the Board of Directors in its March 19 meeting, and incorporated in every subsequent instance of the investment credit pass-through by Trailer Train, was that the designated cars would be leased to the recipient railroad pursuant to a formal written lease and such recipient railroad would, in turn, relinquish such cars to its various participating railroads, including the recipient, pursuant to the Form A Car Contract. Monies collected by Trailer Train in return for furnishing the cars to railroads pursuant to the Form A Car Contract would apply against, and in such a fashion, eliminate rental obligations of the lease under the investment tax credit leases
 (R. 12 Affidavit of Markel L. Albrecht).
 
 
 [11]
 See note 2 supra (explaining accounting arrangement between Trailer Train and member railroads)
 
 
 [12]
 Delivery in the case of ITC leased cars was, of course, constructive. The property interest in a member railroad was created when the lease arrangements were complete
 
 
 [13]
 The district court found that lease arrangements were made under a contract separate from the Car Contract. Seaboard states that whatever the terms of the ITC lease contract, they cannot be binding upon Seaboard, which never received the lease. Even if the unexecuted lease documents could not bind Seaboard, Seaboard's basis for relief here is some other contract, perhaps an oral agreement to enter into an ITC lease
 
 
 [14]
 Trailer Train also argues arbitration would be futile because of several legal defenses to the contract. As we uphold the trial court's determination that arbitration is not required, we need not reach these other issues presented