DOTHAN COCA–COLA BOTTLING CO., INC., a Corporation, Montgomery Coca-Cola Bottling Co., Inc., a Corporation, Plaintiffs-Appellees,

v.

UNITED STATES of America, Defendant-Appellant.

No. 83–7107.

United States Court of Appeals, Eleventh Circuit.

Nov. 5, 1984.

Glenn L. Archer, Jr., Asst. Atty. Gen., Tax Division, D.O.J., Michael L. Paup, Chief, Appellate Section, Richard Farber, Stephen Gray, Washington, D.C., for defendant-appellant.

M.R. Nachman, Jr., Steiner, Crum & Baker, Montgomery, Ala., for plaintiffs-appellees.

Before RONEY and JOHNSON, Circuit Judges, and MORGAN, Senior Circuit Judge.

RONEY, Circuit Judge:

Plaintiff-taxpayers Dothan Coca-Cola Bottling Company, Inc. and Montgomery Coca-Cola Bottling Company, Inc. sued to recover income taxes and interest paid for the fiscal years ending 1965 through 1969 on the ground that the Internal Revenue Service Commissioner's classification of taxpayers as personal holding companies during these years was erroneous. The district court, 561 F.Supp. 1261, held that payment of certain sums to taxpayers, in connection with the lease of tangible assets and the right to bottle Coca-Cola, were rent for tangible assets and not royalties, therefore, not personal holding company income and taxpayers were not personal holding companies. Judgment was entered for the plaintiff taxpayers for the 70 percent penal-ty tax imposed on personal holding companies under 26 U.S.C.A. § 541 of the Internal Revenue Code, which had been assessed against and paid by them for the period at issue. The Government appeals. We affirm.

Two statutorily-defined criteria determine whether a company is subject to the § 541 penalty tax: (1) more than 50 percent of the company's stock must be owned by fewer than six individuals, *see* 26 U.S.C.A. § 542(a)(2); and (2) at least 60 percent of the company's adjusted ordinary gross income, as defined in § 543(b)(2), for the taxable year must be personal holding company income as defined in § 543(a). Since it was stipulated that taxpayers met the first criterion, the controversy in this case revolves around the second.

The issue turns on whether payments made to the taxpayers were rent for tangible assets or royalties for the Coca-Cola franchise. Essentially, this is a question of fact. Since the 1930s, when plaintiff-taxpayers were incorporated, the taxpayers have leased their tangible assets and sublicensed their right to bottle and sell Coca-Cola to the affiliated partnerships which first transferred these assets to the taxpayers in exchange for shares of common stock as an incident of taxpayers' incorporation. Thus, taxpayers have never actively operated as bottling companies.

In late 1955, taxpayers began charging the partnerships ten cents for each gallon of Coke syrup purchased in addition to the fixed rental which taxpayers had collected annually from the date of their incorporation. In 1958, the partnerships sold coolers, mechanical equipment, and delivery equipment to taxpayers, and a revised lease agreement and sub-bottlers contract was executed. This agreement provided, among other things, for gallonage payments of twenty cents to be paid by the partnerships.

The question before the court was whether these payments constituted royalties for a franchise, or compensation for the use of property, or consideration for

both. If, as the Government contends, the payments represented a royalty, then taxpayers are holding companies subject to the tax on the undistributed passive income of personal holding companies, see 26 U.S.C.A. § 541. If the payments constituted compensation for the use of tangible property, as the district court decided, taxpayers are not personal holding companies for purposes of the tax. If the payments covered both the franchise and the lease of property, plaintiffs are subject to the tax only if more than six cents of each twenty-cent payment were attributable to franchise royalties.

The district court's decision in favor of the taxpayers was based upon a record comprised of documents and transcripts of evidence presented to the Court of Claims trial court in an action involving another taxpayer, but with identical factual and legal issues. That trial lasted over a week and produced a record in excess of 1300 pages. The Court of Claims trial court, on that record, recommended a decision in favor of the taxpayer. This recommendation, however, was rejected 2–1 by a three-judge panel of the Court of Claims which decided the case for the Government. *See Coca-Cola Bottling Co., Inc. v. United States,* 615 F.2d 1318, 222 Ct.Cl. 356 (1980).

The parties in this action stipulated to use of the record from that proceeding in lieu of relitigating the identical issues before the district court. Specifically, the stipulation provided that "all operating facts concerning entities involved in the Court of Claims proceedings are identical to those concerning the operations of the entities involved in the proceedings before [the District] Court." The court could "consider the transcript [from that proceeding] as applicable in all relevant respects to the entities involved in [this] litigation...."

The parties differ in their views of the degree of deference which this Court should afford the district court's decision. The key to this appeal is the standard of review that should be given to the district court's determination. The Government contends we should defer to the Court of

Claims decision and overturn the district court's findings. The Government first argued we should make a *de novo* review since the district court neither conducted a trial nor observed witnesses but decided the cases on the stipulated record from the Court of Claims. In its reply brief, the Government noted conflicting and unclear intercircuit and intracircuit decisions on the point and argued we should review the decision "free of the constraints of the clearly erroneous rule." It then asserts the decision cannot stand even if the Court should apply an "ameliorated clearly erroneous" standard of review. The taxpayer simply argues that the findings and conclusions of the district court are due to be affirmed "under the standard of review of Fed.R.Civ.P. 52(a) which requires affirmance unless these findings are clearly erroneous."

Our review of relevant precedent indicates that the circuits are split on the question of whether a district court's decision on an exclusively documentary record should be reviewed under the same "clearly erroneous" standard which applies to trials where live testimony is presented and witness credibility is a factor. *Compare, Maxwell v. Sumner,* 673 F.2d 1031, 1036 (9th Cir.), *cert. denied,* 459 U.S. 976, 103 S.Ct. 313, 74 L.Ed.2d 291 (1982) *and Constructora Maza, Inc. v. Banco de Ponce,* 616 F.2d 573, 576 (1st Cir.1980) ("clearly erroneous" rule applies even when findings are based solely on documentary evidence or on inferences from undisputed facts) *with Atari, Inc. v. North American Philips Consumer Electronics Corp.,* 672 F.2d 607, 614 (7th Cir.), *cert. denied,* 459 U.S. 800, 103 S.Ct. 176, 74 L.Ed.2d 145 (1982) *and Lydle v. United States,* 635 F.2d 763, 765 n. 1 (6th Cir.1981) (holding the "clearly erroneous" test inapplicable in "paper cases" where the records are purely documentary).

Even within this Circuit, the law is not entirely clear. *Compare Jurek v. Estelle,* 623 F.2d 929, 958 (5th Cir.1980) (en banc)

> ... the clearly erroneous rule as it is applied in this Circuit does not apply to

inferences drawn from documents, transcripts or undisputed facts. Thus, the rule is not used where it is not useful: in situations where the reviewing court is in the same position to review the evidence as the Court below.

*with Seaboard Coast Line Railroad Co. v. Trailer Train Co.,* 690 F.2d 1343, 1348–1349 (11th Cir.1982)

When, as here, the district court reaches its determinations solely on the basis of depositions, affidavits, and documents, the burden of establishing clear error is not so heavy, and the clearly erroneous rule is somewhat ameliorated, '[n]evertheless, where the conclusions of the trial judge may reasonably be inferred from the record, such conclusions should not be disturbed on appeal ... even though conflicting inferences of equal reasonableness may be drawn from a review of the same body of evidence.'

(citations omitted).

Rule 52(a) of the Federal Rules of Civil Procedure states only that "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." The Advisory Committee Note to the original rule explained that the "clearly erroneous" test "is applicable to all classes of findings in cases tried without a jury whether the finding is of a fact concerning which there was conflict of testimony, or of a fact deduced or inferred from uncontradicted testimony," but did not expressly address the question of cases tried on purely documentary records. A recently released preliminary draft of a proposed amendment to Federal Rule 52(a) and the accompanying Committee Note, copies of which were provided to this Court by taxpayers, indicates that the "clearly erroneous" standard remains viable where testimony is in documentary form. Specifically the recommendation alters the rule to state unequivocally that "[f]indings of fact, *whether based on oral or documentary evidence,* shall not be set aside unless clearly erroneous, and

due regard shall be given to the opportunity of the trial court to judge the credibility of the witness *and to the need for finality."* The Committee Note explains the reasoning behind the proposed Amendment:

The principal argument advanced in favor of a more searching appellate review of findings by the district court based solely on documentary evidence is that the rationale of Rule 52(a) does not apply when the findings do not rest on the trial court's assessment of credibility of the witnesses but on an evaluation of documentary proof and the drawing of inferences from it, thus eliminating the need for any special deference to the court's findings. These considerations are outweighed by the public interest in the stability and judicial economy that would be promoted by recognizing that the trial court, not the appellate tribunal, should be the finder of the facts. To permit courts of appeals to share more actively in the fact-finding function would tend to undermine the legitimacy of the district courts in the eyes of litigants, multiply appeals by encouraging appellate retrial of some factual issues, and needlessly reallocate judicial authority.

The Supreme Court has held that a finding is "clearly erroneous" when "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Company,* 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1947). The Court has never intimated that a lesser standard applies when a trial court's determination is based solely upon documentary evidence.

█ In the interests of finality and for the reasons set forth in the proposed Advisory Committee Note above, we proceed under the "clearly erroneous" standard and affirm the holding of the district court. Even if we accepted the principle that there may be some amelioration of this standard when applied to documentary evidence, there is no reasoned basis for not applying the clearly erroneous rule to the review of

testimony, even though that testimony came before the trier of fact in the form of transcripts. The parties quite appropriately stipulated to the transcripts from the prior proceedings. It would be inefficient to suggest that the testimony presented by the taxpayers should have been presented live simply to accord to the district court's findings the benefit of the clearly erroneous rule. We note that the standard applied by the Court of Claims to its trial court's recommended decision in the case was slightly different. Specifically, the Court of Claims stressed in its opinion that a presumption of correctness is afforded the trial court's findings of fact, and that the presumption "may be applied less stringently to documentary evidence. With documentary evidence the trial judge is in no special position to rule on the credibility or applicability of such evidence; as such, our review of findings based on documentary evidence may be more severe" (citation omitted). 615 F.2d 1318, 1322, 222 Ct.Cl. 356 (1980). A strong dissent stressed that the majority had engaged in appellate fact finding. 615 F.2d at 1332.

■ With the proper standard of review in hand, the controlling facts found by the district court cannot be overturned on appeal. In a thorough and carefully reasoned opinion, the district court held that plaintiff should prevail because the 20-cents-per-gallon payment "was intended to, and actually did, apply to rental of tangible assets and was not a payment of a royalty by the partnerships for the use of Taxpayer's franchise." The court stressed that its review of the evidence indicated that, contrary to the analysis made by the Court of Claims, plaintiffs' position was supported by the preponderance of the objective docu-

mentary evidence as well as by the testimony of the plaintiffs' accountant. Specifically, the trial court examined the 1956 and 1958 lease agreements, the testimony of taxpayers' expert witness who agreed that the franchise had no value, and the Government's expert testimony on this point, which the district court found to be in large part "conflicting, ambiguous, and confusing." The court noted that the total rent called for in the leases and sub-bottlers contract was not sufficient to cover the fair rental value of both the tangible and intangible assets leased, a fact which provides further support for plaintiffs' position that the per-gallon payments were for the lease of tangible assets rather than for the Coca-Cola franchises, and that the rentals were not merely a facade.

We therefore affirm the holding of the district court based on the extensive memorandum opinion which carefully evaluated all the evidence in the record. We need not reach plaintiffs' alternative contention that the amounts paid by the partnerships were for shares of a joint venture and are therefore exempt from the tax on personal holding company income.

AFFIRMED.

---

JOHNSON, Circuit Judge, dissenting:

The majority holds that the key to this appeal is the standard of review applied to the district court's factual findings. I disagree. Though the proper standard of review is undoubtedly in dispute,[1] even under the clearly erroneous standard the finding that a Coca-Cola bottling franchise has little or no value is in error.

A factual finding is clearly erroneous if "the reviewing court on the entire evidence

---

[1] In two separate lines of precedent, this Court has considered the standard of review to be applied when a district court's decision is based solely on written evidence, as in this case on the transcript of trial proceedings in another court. Some precedent holds that review by this Court "is unconstrained by the usual strictures of the clearly erroneous standard." *Nash v. Estelle,* 597 F.2d 513, 518 (5th Cir.) (en banc), *cert. denied,* 444 U.S. 981, 100 S.Ct. 485, 62 L.Ed.2d 409 (1979); *Robinson v. Vollert,* 602 F.2d 87, 92

n. 8 (5th Cir.1979). Other decisions apply the clearly erroneous standard, without distinguishing the inconsistent precedent. *See Green v. Russell County,* 603 F.2d 571, 573–74 (5th Cir. 1979); *Seaboard Coast Line R.R. Co. v. Trailer Train Co.,* 690 F.2d 1343, 1349 (11th Cir.1982). However, the Court applied the clearly erroneous standard in the second line of precedent with the unexplained "ameliorated" qualification. *Seaboard Coast Line, supra,* 690 F.2d at 1349.

is left with the definite and firm conviction that a mistake has been committed," *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948); *Lincoln v. Board of Regents of University System of Georgia,* 697 F.2d 928, 940 (11th Cir.1983), *cert. denied,* ___ U.S. ___, 104 S.Ct. 97, 78 L.Ed.2d 102 (1983), and when a trial court's decision is based solely on documentary evidence, "the burden of establishing clear error is not so heavy as in the normal case." *Green, supra,* 603 F.2d at 573. Moreover, the taxpaying corporations and the partnerships involved here were under the control of a few related individuals having no adverse economic interests. Under these circumstances the transactions are subject to special scrutiny. *Tulia Feedlot, Inc. v. United States,* 513 F.2d 800, 805 (5th Cir.), *cert. denied,* 423 U.S. 947, 96 S.Ct. 362, 46 L.Ed.2d 281 (1975). After giving this case such scrutiny, I am firmly convinced that the Government has met its burden of establishing a very critical erroneous factual finding by the district court.

The district court held that the gallonage payments consisted entirely of rents for tangible assets and not royalties for franchises. The court endorsed the testimony by expert witnesses that a Coca-Cola franchise has little or no value. With due respect to the district court and the majority, common sense and economic reality dictate a different conclusion. The value of a Coca-Cola franchise is substantial.

Each taxpayer's franchise granted it the exclusive and perpetual right to bottle and sell Coca-Cola within a prescribed geographic territory. The franchises were transferable, and the partnerships' ability to bottle and sell Coca-Cola hinged upon their obtaining the franchise rights from the taxpayers. Of course, obtaining the franchise rights did not guarantee a profitable bottling enterprise. A bottler's profits are a function of its efficiency in managing and operating a bottling plant. To say that "the mere holding of a franchise to bottle and sell Coca-Cola does not assure profit" misses the point. Whether the mere holder

of a Coca-Cola franchise realizes a profit depends on the market demand for the franchise. There are no doubt a number of investors willing to purchase the franchise rights from the taxpayers in order that they might set up bottling operations. What these investors are willing to pay is the true value of the taxpayers' franchises.

In this case, however, the sales of franchise rights were made privately and between entities owned by the same individuals. The failure of these individuals to assign the franchises definite values does not alter the economic reality of the transactions. The economic reality is that the franchises have substantial value. *See, e.g., Hugh Smith, Inc. v. Commissioner,* 8 T.C. 660, 673 (1947), *aff'd per curiam,* 173 F.2d 224 (6th Cir.1949), *cert. denied,* 337 U.S. 918, 69 S.Ct. 1161, 93 L.Ed. 1728 (1949). Contemporaneous documentation by the taxpayers supports this conclusion. *See Montgomery Coca-Cola Bottling Co. v. United States,* 615 F.2d 1318, 1325–27, 222 Ct.Cl. 356 (1980).

Taxpayers' expert witnesses testified to the contrary, stating that in evaluating a Coca-Cola bottling company for purposes of merger or acquisition no value is assigned to the company's franchise. According to these witnesses, the value of the franchise is entirely dependent on the company's managerial skills and established good will. Though it is true that managerial ability greatly determines the value of a particular bottling operation, even a well-managed operation can sell no Coca-Cola unless the bottler first purchases the franchise rights.

As for a specific bottling company's good will, it operates only to the extent customers purchase one bottler's Coca-Cola instead of another bottler's Coca-Cola. Yet few consumers know or care which bottler produced the Coca-Cola they consume. The vast national demand among consumers for Coca-Cola products cannot be attributed to an individual bottler's localized efforts toward creating good will. This demand is primarily the result of extensive

national advertising directed and financed by the Coca-Cola Company of Atlanta, Georgia. More importantly, this demand is for a product that can be purchased only from a franchised Coca-Cola bottler. While it is true that a Coca-Cola franchise may not give its holder a competitive edge over makers of other soft drinks, such as Pepsi or Seven Up, it does give its holder an extremely valuable monopoly. Only the franchise holder can tap the established demand for Coca-Cola. The competitive edge over other investors interested in bottling and selling Coca-Cola is absolute.

The district court and the majority note that the payments made to the taxpayers were not sufficient to cover the fair rental value of all tangible and intangible assets, including the franchises, that were leased to the partnerships. I am not convinced that the value of "all" the assets has been established, unless the value assigned to the franchises is zero, in which case an error has clearly been made.[2]

Because the district court erroneously concluded that the Coca-Cola franchises had little or no value, it did not characterize any portion of the 20-cents per gallon payments as royalties. I would reverse this holding and remand for a specific valuation.

---

**2.** Moreover, even assuming the payments fell short of the fair rental value of all the assets leased, this would not dispose of the Government's contention that the taxpayers created a facade for tax sheltering purposes. The taxpayers argue that, if their intent had been to shelter income, they would have sheltered more by making payments in excess of the assets' fair rental value. It is equally plausible, however, that the underpayment evidences an attitude of

caution in structuring financial arrangements having the potential for significant tax exposure. The 70-percent penalty tax imposed by Section 541 of the Internal Revenue Code operates specifically to discourage taxpayers from putting large amounts of their income into tax-sheltering corporations. The underpayment in this case may actually be reasonable compensation in light of the risks of audit and penalty assessment.