**DOTHAN COCA–COLA BOTTLING COMPANY, INC., A Corporation, and Montgomery Coca-Cola Bottling Company, Inc., A Corporation, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. Nos. 78–27–S, 78–172–N.**

United States District Court, M.D. Alabama.

Dec. 10, 1982.

these minutes was given to Richmond for his own personal enlightenment.

M.R. Nachman, Jr., Steiner, Crum & Baker, Montgomery, Ala., for plaintiffs.

Jack D. Warren, Atty., Tax Div., Dept. of Justice, Washington, D.C., for defendant.

## MEMORANDUM OPINION

VARNER, Chief Judge.

These causes are now submitted to the Court for final decision on the evidence specified in the Pretrial Order entered herein March 19, 1982.[1] These causes were instituted by Plaintiffs for the recovery of income taxes and interest paid for the fiscal years ended September 30, 1965, through September 30, 1969. The cases present common questions of fact and law and were consolidated by Order of this Court on August 31, 1978.

The Commissioner of the Internal Revenue Service (IRS) assessed a deficiency of $190,626.64, plus interest, against the income tax liability of Plaintiffs for fiscal years ending September 30, 1965, 1966, 1967, 1968 and 1969. Said deficiencies, together with interest, were paid by the Plaintiffs on August 14, 1973. On July 30, 1975, Plaintiffs filed claims for refunds for each of the said fiscal years involved. These claims for refunds were based on the premise that the IRS Commissioner had erroneously classified Plaintiffs as personal holding companies, thus subjecting all of the Plaintiffs' income to the 70 percent penalty tax imposed on personal holding companies under 26 U.S.C. § 541 of the Internal Revenue Code. Plaintiffs contend that, because of one of three alternative reasons, they do not operate as personal holding companies and are not subject to the tax imposed by § 541 of the Internal Revenue Code. Defendant contends that Plaintiffs do operate as personal holding companies and, thus, are subject to the tax imposed by § 541 of the Internal Revenue Code.

1. "6. The parties agree that either may introduce at the trial any portion of the transcript and the exhibits relating to the Court of Claims case styled 'Montgomery Coca-Cola Bottling Company v. The United States, No. 275–73' (hereafter 'Transcript'). Further the parties also agree that either party may submit to the Court for its consideration any or all rulings, orders or decisions rendered in the Court of Claims by the trial judge or the Court of Claims.

"The parties further agree, for all purposes in this litigation, that all operating facts concerning entities involved in the Court of Claims proceedings are identical to those concerning the operations of the entities involved in the proceedings before this Court. The effect of this agreement is that this Court may consider the transcript as applicable in all relevant respects to the entities involved in the litigation before this Court.

"The parties further agree that such further testimony from live witnesses or documentary materials may be offered in evidence as the parties may desire if the Court and adverse parties are informed thereof on or before March 5, 1982." See, Pretrial Order entered March 19, 1982, pp. 6–7.

It is stipulated by and between the parties that the following are all of the issues in controversy in these causes:

1. THE SETTLEMENT ISSUE. The first issue this Court must decide is whether the negotiations between the parties constituted a binding compromise and settlement of these causes. Plaintiffs contend that a settlement was reached when the "appropriate authorities" of the United States Government failed to disapprove or reject Plaintiffs' settlement proposal of June 22, 1981—which was recommended by Defendant's counsel—within a "reasonable" time after its assurances of "prompt notification". Defendant contends that Plaintiffs' said offer of settlement was rejected by the appropriate authorities of the United States Government on December 1, 1981.

2. THE PER–GALLON–PAYMENT IS-SUE. The second issue this Court must decide is whether any or all of the 20-cents-per-gallon consideration paid to Plaintiffs by certain partnerships related to said Plaintiffs constitutes compensation for the use of property, thereby relieving Plaintiffs of holding-company status, or whether said payment constitutes a royalty which would place Plaintiff-Taxpayers in the position of being holding companies.

3. THE JOINT VENTURE ISSUE. The third issue in controversy is whether Taxpayer-Corporations and the sub-bottler partnerships were engaged in a joint venture. Plaintiffs contend that they were engaged in a joint venture with the partnerships, and, thus, regardless of the classification of the 20-cents-per-gallon payment, there could be no personal holding company income since the entire amount paid by the partnerships to Plaintiff-Taxpayers should be regarded as Plaintiffs' share of the joint venture. Defendant contends that the relationship between Plaintiff-Taxpayers and the sub-bottler partnerships was not that of a joint venture.

4. THE VALUATION ISSUE. The fourth and final issue this Court must decide is what portion, if any, of the 20-cents-per-gallon payment is royalty payment and what portion is payment for the use of the real and personal property owned by Plaintiff-Taxpayer Corporations and used by the partnerships. This issue will be decided only if this Court finds that the per-gallon payment is composed of both rent and royalty.

## I. THE SETTLEMENT ISSUE

Plaintiffs' counsel contends that he and Defendant's trial attorney, Hon. Jack Warren, (hereinafter collectively trial counsel), reached an understanding for the compromise and settlement of these actions. As grounds for said contention, Plaintiffs rely on a letter from Plaintiffs' counsel to Defendant's counsel dated June 12, 1981. In said letter, Plaintiffs' counsel states that it is his understanding that any action on the part of the government would be "prompt" and that he has assured the Court that this process will be completed within 90 days. On the same date, i.e., June 12, 1981, trial counsel filed a joint motion asking this Court to postpone the pretrial hearing scheduled for June 18, 1981. As grounds for said motion, trial counsel stated they had arrived at a settlement proposal between themselves which they had recommended to their respective clients. Apparently, Plaintiffs' counsel had already obtained the approval of his clients for the settlement proposal, thus making consummation of said settlement contingent upon Defendant's counsel's obtaining approval from the appropriate authorities of the United States Government. In further support of their position, Plaintiffs refer the Court to a letter from Assistant Attorney General Stephen Shapiro dated June 19, 1981, in which Shapiro stated " * * * that the settlement negotiations concluded by you and Mr. Warren will result in bringing the cases to a mutually satisfactory conclusion." However, further study of said letter reveals that, while Mr. Shapiro did express his hope that a settlement would be forthcoming, he unequivocally stated in the same letter that " * * * offers of settlement in tax cases are subject to independent review in the department and while the actions recommended thereon by our

trial attorneys are given serious consideration, they are not controlling, the ultimate right to accept or reject being reserved as a function of independent review." Following the above-mentioned communications, there were several more correspondence between the parties concerning the settlement offer and the problems of delay. On October 26, 1981, this Court wrote Mr. Shapiro and expressed its concern over the length of the Defendant's delay in responding to said settlement offer. In addition, this Court advised Mr. Shapiro that the cases were being placed on a pretrial docket, and if said settlement was neither approved nor disapproved by that time, an attorney for the Defendant would be expected to attend said pretrial hearing, prepared to proceed toward the ultimate resolution of these cases.

While this Court is chagrined at the Defendant's inordinate delay in responding to the above-mentioned settlement offer, the Court also feels that Plaintiffs' reliance upon *United States v. Armbruster,* 446 F.Supp. 866 (S.D.N.Y.1977), as being dispositive of the settlement issue is misplaced. The facts upon which the *Armbruster* decision was rendered are readily distinguishable from the facts in the instant cases. For the sake of efficiency, this Court will not now attempt to undertake same. Suffice it to say, this Court is not persuaded by *Armbruster* that it should now bind these parties to the Plaintiffs' proposed offer of settlement. While it does appear that the Government has dragged its feet in these cases, it is the opinion of this Court that it should not and cannot force the Defendant to be bound under Plaintiffs' offer of settlement on the basis that Defendant failed to accept or reject said offer within a certain period of time prescribed by Plaintiffs. Therefore, the premises considered, this Court finds that the negotiations between the parties in these causes did not constitute a binding compromise and settlement.

## II. THE PER–GALLON PAYMENT ISSUE

The second issue this Court must decide is whether any or all of the 20-cents-per-gallon consideration paid to the Plaintiff-Taxpayer-Corporations by the sub-bottler partnerships constitutes compensation for the use of property or whether it constitutes a royalty, and, thus, whether Plaintiff-Taxpayers were or were not personal holding companies during the years in question. If the Court finds that none of the 20-cents-per-gallon payment is a royalty, the Plaintiffs are entitled to judgment, but if the Court finds that said payments include a charge for royalties, then the Court must determine what part of the payments is royalty and what part is rent and what part of the ordinary gross income, if any, of the Plaintiff-Taxpayer-Corporations is composed of royalties. If the Plaintiffs did not have personal holding company income— that is, if they did not receive royalties in excess of ten percent of their ordinary gross income—they are not subject to the penalty tax of 26 U.S.C. § 541 under which the IRS assessed the deficiencies which are the subject of these causes. Plaintiffs contend that the gallonage payments in issue were intended to be a partial rental payment for the use of tangible real and personal property owned by Plaintiffs and leased to two sub-bottler partnerships, and not a payment for the use by the partnerships of Plaintiffs' franchise. Defendant contends that the Plaintiffs and the two sub-bottler partnerships intended the 20-cents-per-gallon payment to be a payment by the sub-bottler partnerships for the use by said partnerships of Plaintiffs' franchise and, thus, was a royalty payment.

Since 1934 a special tax has been imposed on so-called "personal holding companies". In *Fulman v. United States,* 434 U.S. 528, 531, 98 S.Ct. 841, 844, 55 L.Ed.2d 1 (1978), the Supreme Court of the United States stated:

"The object of the personal holding company tax is to force corporations which are 'personal holding companies' to pay in each tax year dividends at least equal to the corporation's undistributed personal holding company income, i.e., its adjusted taxable income less dividends paid to shareholders of the corporation, see Sec-

tion 545—thus *insuring that taxpayers cannot escape personal taxes by accumulating income at the corporate level. This object is effectuated by imposing on a personal holding company both the ordinary income tax applicable to its operation as a corporation and a penalty tax of 70 percent on its undistributed personal holding company income."* [emphasis added]

Two tests must be met for a company to come within the parameters of the § 541 penalty tax. First, five or fewer individuals must own more than 50 percent of the stock in the subject company [§ 542(a)(2)]. Second, § 542(a)(1) imposes an "adjusted ordinary gross income requirement". For this Court's purposes, a corporation which meets the stock ownership requirements—and it is stipulated that Plaintiff-Taxpayers do meet said stock ownership requirements—is a personal holding company if at least 60 percent of its adjusted ordinary gross income [as defined in § 543(b)(2)] for the taxable year is personal holding company income [as defined in § 543(a)]. In the instant cases, Plaintiffs' adjusted ordinary gross income for each year in question was equal to Plaintiffs' ordinary gross income for that year.

Pursuant to § 543(a), personal holding company income consists of dividends, interest and royalties, adjusted income from rents, and amounts received as compensation for the use of property of a corporation from a shareholder owning 25 percent or more of its outstanding stock. Amounts received as compensation for the use of property from a shareholder are, however, included in personal holding company income if, and only if, the corporation receives other personal holding company income in excess of ten percent of its ordinary gross income. In calculating the amount of such other personal holding company income, rents are not included. The Defendant concedes that the bulk of Plaintiffs' income during the tax years in question was, in fact, compensation for the use of tangible property owned by Plaintiffs and leased to the two partnerships, i.e., rent, and that, in order for that income to be

included in personal holding company income, Plaintiffs must have received more than ten percent of its ordinary gross income in other personal · holding company income, i.e., royalty payments. While Plaintiffs admittedly received small amounts of interest falling within the category of personal holding company income, those amounts, in and of themselves, were far below an amount equaling ten percent of Plaintiffs' ordinary gross income. If during any of the tax years in question Plaintiffs received royalty payments for the use of their franchise right—which, when added to Plaintiffs' above-mentioned interest income, exceeded ten percent of their ordinary gross income for that year—all of the amounts received by Plaintiffs as compensation for the use of their property in that year must be included in personal holding company income for that year and are subject to personal holding company tax. If not, however, Plaintiffs do not meet the income requirement of § 542(a)(1) for that year and are not subject to personal holding company tax.

Before addressing the above-stated issue, it is necessary to go into the lengthy and complex factual background surrounding these cases, as well as the applicable law. Due to the massive volume of evidence, Plaintiffs and Defendant have stipulated that the same questions of fact and law are applicable to both the Dothan and Montgomery operations. Therefore, this Court's discussion will be limited to Plaintiff, Montgomery Coca-Cola Bottling Company's operation.

Prior to and during the period here relevant, the right to bottle and vend Coca-Cola in a particular geographical territory was controlled by the Coca-Cola Company of Atlanta, Georgia, an entity unrelated to Plaintiffs. Plaintiff-Taxpayers in these causes are known as "first-line bottlers", which are bottlers who have been granted the right to bottle and vend Coca-Cola within a prescribed territory. Said rights were originally granted by the Coca-Cola Bottling Company of Atlanta, Georgia, to W.A. Bellingrath at the turn of the century. In

exchange for these rights, Mr. Bellingrath had agreed, *inter alia,* to purchase all Coca-Cola syrup "required or used" in the preparation for market of his bottled goods at a stated price per gallon of syrup purchased. As of 1934, this price per gallon of syrup was $1.30.

In 1934, Plaintiff, Montgomery Coca-Cola Bottling Company, Inc., (hereinafter Taxpayer), was incorporated. Prior to said incorporation, Mr. Bellingrath had operated the business of selling and bottling Coca-Cola in his assigned territory as a partnership with his wife. Once Plaintiff-Taxpayer was incorporated, the above-said partnership's assets—including real estate, bottling plant, machinery, fixtures, and the exclusive right to bottle and sell Coca-Cola— were transferred from Mr. Bellingrath to Taxpayer in exchange for 600 shares of common stock. Since its inception, Taxpayer has never operated as an active bottling company. Following Taxpayer's incorporation, Taxpayer entered into a lease agreement and sub-bottlers contract with its affiliated partnerships whereby Taxpayer leased its tangible assets and sublicensed its right to bottle and sell Coca-Cola to said affiliated partnerships for the fixed annual rental of $10,200.00. Said lease agreement and sub-bottler contract, in effect from 1934 to 1955, did not contain any stated or separate gallonage payment, nor did any sub-bottler contract in effect during that period contain a markup above the original $1.30 figure. During said period (1934 to 1955), the amount of compensation paid to Taxpayer for the use of Taxpayer's tangible assets by the partnerships was increased from time to time. However, during said period, all of such compensation paid to Taxpayer was paid in fixed amounts. In addition, during the same said period, Taxpayer's stockholders made capital contributions totaling approximately $360,000.00 to Taxpayer. Taxpayer alleges, and this Court so finds from the undisputed evidence, that said stockholder contributions made during said period were made because the amount of compensation paid to Taxpayer by the partnerships for the use of Taxpayer's tangible assets were insufficient to enable Taxpayer to meet its business requirements for the purchase of additional land, buildings and equipment.

During the period 1941 through 1961, Mr. S.E. Elmore was General Manager and Chief Operating Officer of Taxpayer and its affiliated partnerships. Mr. Elmore conducted the business of Taxpayer and the partnerships without active participation of the stockholders or of the partners. At this point, it should be reiterated that, during the period 1934 to 1955 (a period of more than 20 years), no payment at all was made by the affiliated partnerships to Taxpayer as consideration for the sub-bottlers contract; no lease provided for payment for use of the franchise; no sub-bottlers contract provided for compensation for the use of the franchise; and no surcharge or markup per gallon over the $1.30 cost to Taxpayer of Coca-Cola's syrup was charged to said partnerships. Apparently, the only reason for the existence of a sub-bottlers contract at all was the insistence of Coca-Cola of Atlanta (a corporation unrelated to Taxpayer) that an entity having first-line bottling rights could permit others to bottle and sell Coca-Cola within its territory only by use of such a sub-bottler contract.

Due to rapid changes occurring within the bottling industry in the 1950's, Mr. Elmore, as Chief Executive Officer of Taxpayer and its affiliated partnerships, was faced with the problem of acquiring enough cash to meet expected needs for new equipment. In response to this problem, Taxpayer's Board of Directors decided in late 1955 to change the basis upon which Taxpayer charged rent for the use of its tangible properties by the partnerships from a fixed payment to a fixed payment plus ten cents per gallon of syrup purchased by the partnerships. The minutes of Taxpayer's Board of Directors meeting reflect that, effective January 1, 1956, the Montgomery partnership agreed to pay Plaintiff Montgomery Coca-Cola (Taxpayer) for the use of Taxpayer's properties a "flat rental" of $36,000.00 per year plus ten cents per gallon of Coca-Cola syrup purchased by said partnership. The lease agreement between Tax-

payer and the partnership was executed in May, 1956, and specified a fixed rental of $36,000.00 with an additional rental computed on the basis of ten cents per gallon of Coca-Cola syrup purchased. This lease contained the following language:

"The parties have determined that a further general *increase* in the *amount of rent* payable by the partnership will be appropriate in order to reflect the increased rental value resulting from additional capital investments by the corporation in the leased property subsequent to the date of the last rental increase as well as to assist the corporation in defraying the cost of a proposed modernization program entailing additional capital improvements of substantial magnitude. The parties agree that such improvements are necessary and desirable from the standpoint of maintaining the competitive efficiency of the corporation's Coca-Cola bottling plant. [emphasis added]

"It has also been determined that the *rental increase* made effective by this agreement *should be supplementary to the fixed rental schedule* (as set forth in Paragraph 1 hereof) and should be based upon and measured by the number of gallons of Coca-Cola syrup which the partnership purchases from the corporation or which it purchases direct from the Coca-Cola Bottling Company of Atlanta, Georgia. The parties also understand that this *supplemental rental agreement will be subject to further revision following completion by the corporation of the contemplated capital improvement and modernization program, in order to give effect to the enhanced value of the plant, or otherwise to reflect the rental value of the premises and rights involved in the light of prevailing economic conditions.*" [emphasis added] See, Agreement between Montgomery Coca-Cola Bottling Company, Inc., and Coca-Cola Bottling. Company (Montgomery), a partnership, dated May, 1956.

Therefore, it would appear from the face of the 1956 lease that said lease provisions were neither intended nor designed to take into account in any way an estimated value of Taxpayer's franchise, nor were they intended to compensate Taxpayer for the use of its franchise as such. Rather, it would appear from the face of the lease and the testimony and the documentary evidence that the purpose and intent of said agreement was to increase rental payments for the use by the partnerships of tangible assets owned by Taxpayer by using an incremental factor geared to sales. This would enable Taxpayer, over a period of years, to recoup its cost or outlays for funds expended in the above-mentioned modernization plan by which Taxpayer was to purchase necessary equipment and properties which were, in turn, leased to the partnerships. The preponderance of the evidence clearly indicates that neither of the parties to the 1956 agreement contemplated nor intended that the gallonage payment figure of ten cents per gallon amounted to or related to a payment for the use of Taxpayer's franchise.

By early 1958, it became apparent to Taxpayer and the partnerships that the payments under the 1956 agreement were inadequate to finance the necessary equipment to remain competitive. To alleviate this situation, management concluded that Taxpayer should take over the financing of all equipment used in the bottling operation. To implement this decision, it was decided that the rents paid by the partnerships must be increased so that Taxpayer could provide adequate equipment. Following this decision, the partnerships on October 1, 1958, sold to Taxpayer all of their (1) Coca-Cola coolers, (2) mechanical handling equipment and (3) delivery equipment for a price equal to the book value of these properties to the partnerships. In addition, on October 1, 1958, a revised lease agreement and sub-bottlers contract was executed between Taxpayer and the partnerships. This lease revised the formula for determining the payment the partnerships were to make to Taxpayer. Said payment was to be equal to (1) three and one-third percent of the gross cost of land and equipment, (2) ten percent of the gross cost of machinery and

equipment, (3) 130 percent of depreciation claimed on federal tax returns for automotive equipment and coolers and (4) 20 cents per gallon of Coca-Cola syrup purchased.

In addition to the above-mentioned lease, Taxpayer and the partnerships executed a term sub-bottlers bottle contract on October 1, 1958. The execution of this new sub-bottlers contract between Taxpayer and the partnerships effective October 1, 1958, according to the evidence in this case, resulted solely from the Atlanta Coca-Cola Company's insistence that said sub-bottler contracts, as well as the leases, reflect the new 20-cent-per-gallon surcharge payment factor and that the sub-bottlers agreement be a separate document. Taxpayer complied with the demands of the Atlanta Coca-Cola Company's insistence that there be a separate sub-bottler contract; however, Taxpayer, in its lease with the partnerships, incorporated by reference the 20-cent-per-gallon payments under the sub-bottlers contract into the lease agreement, thus making it a part thereof. The lease agreement executed on October 1, 1958, contained the following language:

"For sundry business reasons, the corporation and the partnership desire to reorganize their relationship and to modify, alter and amend the provisions of said 'SUB–BOTTLERS CONTRACT (TERM)' and said lease. To effectuate same pursuant to written bill of sale and assignment of even date herewith, the partnership has conveyed, for the consideration mentioned therein, to the corporation certain equipment owned by the partnership including without limitation certain automobiles, delivery equipment, rental coolers and personal property more specifically described in said bill of sale and assignment. Likewise, the sub-bottlers contract of December 31, 1951, has been superceded by an instrument of even date herewith, designated 'SUB–BOTTLERS CONTRACT (TERM)', which, inter alia, extends the franchise until December 31, 1968. *Said instrument is incorporated herein by reference and constitutes a part of this transaction.* * * * [I]n consideration of the recitals and of the mutual undertakings of the parties hereto and of the provisions of said 'SUB–BOTTLERS CONTRACT (TERM)' of even date herewith and the making of the payments therein specified which, together with the rentals herein provided for, constitute the consideration payable to the corporation for the use of said Coca-Cola bottling franchise and bottling equipment, the *corporation* by these presents *hereby leases to the partnership and the partnership hereby rents* from the corporation upon the terms, conditions, and covenants hereinbelow set forth, *all of the real and personal property* situated in * * *." [emphasis added]

This lease agreement was subsequently explained in a document dated December 16, 1958, and verified under oath from Elmore Bellingrath Bartlett to The First National Bank of Montgomery in connection with a loan transaction [Plaintiff-Taxpayer's Exhibit 13]. Said document states, *inter alia:*

"The amounts required to be paid by the above quoted paragraphs represents the '*payments therein specified*' referred to in said lease agreements. It is the price differential of twenty cents (20¢) per gallon which constitutes the rental payments by the partnerships to the corporation." [emphasis in original]

It affirmatively appears to this Court from the documentary evidence and testimony in these causes that the leases and sub-bottler contracts executed between Taxpayer and the partnerships, which are the subject of this action, were a legitimate business arrangement whereby Taxpayer's management intended to, and in fact did, enter into said arrangement for the purpose of obtaining needed financing for the purchase of tangible assets. It affirmatively appears to this Court (1) that Taxpayer's management made a legitimate business decision that Taxpayer needed more money for the purchase of tangible assets to remain competitive in the bottling industry in the mid 1950's; (2) that the Taxpayer chose to go about said financing through a legitimate business arrangement whereby the Taxpayer would purchase all assets needed

to carry out a bottling operation and lease them to the partnerships; (3) that Taxpayer legitimately leased said assets to the partnerships; (4) that Taxpayer had no precise formula, and understandably so, whereby it could determine its exact capital needs; (5) that the aggregate of the amounts payable by the partnerships to Taxpayer for the tangible assets under the 1956 agreement were too low to compensate Taxpayer for the use of those assets; (6) that the 1956 agreement contemplated revision in the future if said payments proved to be inadequate; (7) that in 1958 the parties legitimately revised their agreement in an effort to reach an equitable rental payment; (8) that, while said revision could have been set forth in one document—i.e., the lease agreement—Taxpayer chose the lease agreement incorporating the sub-bottler contract's 20-cent-per-gallon payment due solely to the insistence of the Atlanta Coca-Cola Company; (9) that the 20-cents-per-gallon payment factor was intended to supplement the otherwise inadequate rental payments; and (10) that the new 20-cents-per-gallon payment factor was intended to, and actually did, apply to rental of tangible assets and was not a payment of a royalty by the partnerships for the use of Taxpayer's franchise.

In his Opinion and Finding of Fact filed in the United States Court of Claims on December 13, 1978, Trial Judge Wood found that:

"[T]he amounts payable to Plaintiff by the Montgomery and Andalusia partnerships pursuant to the terms of the October 1, 1958, lease agreements, as amended (including the 20-cents-per-gallon surcharge payment factor included in the term sub-bottlers contracts incorporated by reference in the said lease agreements), during the tax years here relevant, were intended to be, and were, rent for the use by the two partnerships of Plaintiff's tangible assets, not payment of rent or royalty by the partnerships to Plaintiff for the use of Plaintiff's franchise. In view of the circumstances facing Plaintiff in 1958 when the said leases were executed, the amount of rent to be paid to it for the use of its tangible assets was necessarily calculated in a somewhat rough-hewn and imprecise manner. That, however, does not obscure or alter the fact that the 20-cents-per-gallon surcharge payment factor was to be a partial payment for the use of tangible, not intangible assets. Moreover, in view of the persuasive and unrebutted testimony of Mr. Haas, Mr. Peters, and Mr. Battle concerning the value of Plaintiff's franchise per se, the intent actually underlying and embodied in the lease does not depart from what Defendant terms 'the economic facts existing at the time' the leases were drawn, but instead recognizes that Plaintiff's franchise had little or no intrinsic value in accords therewith. On this record, a finding that, during the tax years here relevant, none of the 20-cents-per-gallon surcharge payment factor represented a royalty (or rent) for the use of Plaintiff's franchise by the Montgomery and Andalusia partnerships is compelled." See, Finding No. 36.

This Court agrees with Judge Wood's finding. However, on appeal, a three-judge panel of the Court of Claims reversed Judge Wood, holding, *inter alia*:

"The trial judge's ruling is in error on this point because his key finding—that the 20 cents gallonage payment was intended solely to compensate Plaintiff for the partnerships' use of the tangible assets—is based on the testimony of the parties' accountant as to their subjective intent.

"This subjective intent testimony is in conflict with objective documentary evidence of the Plaintiff's business operation: contemporaneous correspondence, leases, agreements, records and reports, etc." *Montgomery Coca-Cola Bottling Co. v. United States,* 615 F.2d 1318, 1325 (Court of Claims 1980).

This Court completely disagrees with the Court of Claims' assessments stated above. It is the opinion of this Court that the preponderance of the objective documentary evidence as well as the testimony in this case show that the 20-cent gallonage pay-

ment was intended solely to compensate Taxpayer for the partnerships' use of the tangible assets, and, therefore, the testimony of Taxpayer's expert witnesses as to the intent of the parties who executed said documents does not conflict with this Court's interpretation of said documents and, indeed, supports the same.

As the Defendant points out on page 14 of its brief: "It is the nature of the payments, not the label or designation, that controls. [citations omitted]." This Court agrees. Yet, the Court of Claims seems to base its opinion largely on the fact that, because an accountant retained by the entities involved in this cause maintained a separate account for the "rent on the franchise", this label, without consideration of the nature of the payments, makes said payment a "royalty" payment. The Defendant's entire case is based on the fact that certain labels and references in certain minute books and on certain checks and accounting journals, conclusively show an intent that all of the gallonage payments be considered as payment for the use of the franchise or a royalty. Yet, as stated above, it is the opinion of this Court that the 1956 and 1958 lease agreements clearly show that the gallonage payment is for the rent of tangible assets, and, thus, even if the above-mentioned documentary evidence coming into existence following the 1958 agreement does conflict with said agreement, said evidence would not conclusively show an intent of the parties but, rather, would merely be evidence to be weighed as to the intent of said parties, and in view of the amount of evidence to the contrary, it carries little weight. This Court agrees with the trial judge's finding that:

"Defendant's assertions that the parties so agreed, and that 'contemporaneous acts' by Plaintiff confirm 'that 20 cents per gallon was payment for franchise rights', are, on this record, contrary to the weight of the credible evidence. Vague allusions to a 'franchise rental' based on gallonage, and other similar ambiguous factors (e.g., accounting captions in Plaintiff's books and records, notes in financial statements, and casual references to 'franchise' rent in minutes of stockholders and Board of Directors meetings and elsewhere), when viewed in context and in light of the whole record, not only do not bear the weight Defendant places on them, but also fail to rebut the clear and convincing proof to the contrary." (Finding 22, n. 26, p. 41).

Mr. A. Wendell Simons testified as an expert for the Taxpayer. Mr. Simons had been with the accounting firm of Ernst and Ernst for 31 years and had been a partner in that firm for 16 years. His firm advised Taxpayer and the partnerships in tax and financial matters since 1941 or 1942. Mr. Simons was personally familiar with the history and background of Taxpayer's 1956 and 1958 arrangements with the partnerships, and he was also familiar with documents and records pertaining to arrangements in effect between Taxpayer and the partnerships prior to 1956. Trial Judge Wood found that Mr. Simons was "candid, responsive, and articulate. His demeanor while testifying was most impressive. He was a highly persuasive and credible witness, and his testimony is accepted herein." (Finding 23). Mr. Simons testified, without dispute, that:

"The purpose of the 20 cents was to pay the Corporation for the use of the tangible property that was used by the partnerships * * *; that there was no other purpose; that the parties knew that the other ingredient in the rental formula specified above—those related to cost of real estate and buildings, cost of machinery equipment, and depreciation claimed on tax returns for trucks and coolers—were 'too low'; and that the purpose of the 20-cent gallon payment was to 'supplement' and take up the slack" (R. 70–74).

Mr. Simons further testified that there were "no tax considerations" involved in the decisions culminating in the lease and rental arrangements of 1958 and thereafter; that the partnerships were in the bottling and selling business, while the Taxpayer Corporation was a financing corporation; that the partnerships suffered a cash

problem because payment of earnings every year to the partners left the partnerships with no cash to invest; that this leasing arrangement enabled Taxpayer to buy equipment; that between 1958 and 1969 Taxpayer bought equipment at an average of about $250,000.00 a year; that Taxpayer purchased said equipment only by virtue of the rental arrangement which is the subject of these actions. [R. 73–75]. The majority of the Court of Claims panel brushed aside this testimony of the one surviving man who probably knew more of the business history of the Taxpayer than anyone else, saying:

> "Simons is 'infected with self-interests' and while his testimony, of course, is admissible he cannot be given the weight accorded it by the trial judge * * *."
> *Montgomery Coca-Cola v. U.S., supra,* at 1327.

Witness castigation of this sort tends to make witnesses scarce and expensive. Simons appears to be a substantial member of an honorable profession, no more shown to be governed by self-interest than any member of the panel of that Court.

This Court is humbled, but appalled, at the need for further litigation in this case. A trial judge of the Court of Claims, weighing live testimony and documentary evidence, concluded that the Taxpayer should prevail. A divided three-judge panel of that Court (615 F.2d 1318) reweighed the evidence and concluded that the preponderance of the evidence favored the Defendant. While it would seem that a presumption of propriety would lie with the trial judge who heard the oral evidence, this Court understands that it must reconsider the evidence and relocate the preponderance of the evidence.[2]

The preponderance of the expert testimony at the Court of Claims trial was to the effect that Taxpayer's franchise in and of itself was not an asset of any fixed or measurable value and, in fact, is of little or no value whatsoever. Taxpayer's expert, Mr. George Haas, who had extensive experience in the leasing business and in the field of mergers and acquisitions within the soft drink industry, testified that, in the evaluation of a soft drink bottling company, current management is the most important single factor. Mr. Haas testified that a soft drink bottling company is entirely dependent upon management's abilities for its success. Haas testified that, when valuing a company, he does not use franchise as a function of evaluation because, in his opinion, the value of a franchise is entirely dependent upon the ability of the management of the entity utilizing the franchise in bottling operations, and, therefore, he assigns no value to franchise in evaluating a soft drink bottling company. Trial Judge Wood found Mr. Haas to be a credible and impressive witness with wide experience in both leasing equipment to soft drink enterprises and in the evaluation of soft drink bottling enterprises. [Finding 34].

Mr. Charles N. Battle was another of Taxpayer's expert witnesses. Mr. Battle is a management consultant specializing in providing consulting services to Coca-Cola bottling enterprises. Mr. Battle has extensive experience in evaluation of such bottling enterprises for estate taxes, mergers, and purchase and sale purposes. In fact, Trial Judge Wood stated in his findings that Mr. Battle is recognized by the Coca-Cola bottling industry and the Coca-Cola Company as "the number one consultant in the industry" [see, Finding 34(b)]. Judge Wood also found Mr. Battle to be an impressive and credible witness. Mr. Battle testified that, in making evaluations of the soft drink bottling company, he also assigned no value to the Coca-Cola franchise. Mr. Battle testified that valuation of a franchise per se is virtually zero and that, independent of the partnerships and their good will and going-concern value, Taxpayer's franchise was "worthless".

Mr. Peters also testified for the Taxpayer as an expert witness. Judge Wood also found Mr. Peters to be a credible and impressive witness and an expert in the evaluation of Coca-Cola bottling companies [Finding 34(c)]. Mr. Peters testified:

**2.** All Court of Claims opinions are a part of the   record here by stipulation.

"I did not find any value to the franchise to the Montgomery Corporation when I did a valuation of the Montgomery Corporation. * * * It is my opinion * * * that the thing that makes this Coca-Cola operation valuable in Montgomery * * * is the quality of the management and the good will that has been built up in an operating company. I believe you are forgetting that the corporation [Taxpayer] is a dormant, nontrading, nonoperating company that holds a franchise granted by the Coca-Cola Company. It does not own that franchise. The Coca-Cola Company can take their franchise back under certain conditions. The corporation does nothing to market Coca-Cola in this area. That is done by the two partnerships. The two partnerships have built up the good will down through the years. The corporation has done nothing to do that." [R. at 645 & 646].

All of Taxpayer's expert witnesses testified that the use of the franchise per se had no value. It should be pointed out that all of Taxpayer's experts valued Taxpayer [the corporation] and the two partnerships separately. The Defendant's experts did not. Rather, Defendant's experts valued the Taxpayer-Corporation and its related partnerships as one entity and not as separate entities. However, it is unnecessary for this Court to involve itself with resolving which is the proper method of valuation since it is the opinion of this Court that the entire 20-cents-per-gallon payment was a rent payment for the use of tangible assets. However, it is the opinion of this Court that the fact, that testimony on the valuation issue elicited from experts for both parties indicated that the total rent called for in the leases and sub-bottlers contract *was not sufficient to cover the fair rental value of both the tangible and intangible assets leased,* is certainly relevant to the per-gallon payment issue. As Judge Wood's opinion states:

"Defendant does not contend that Plaintiff and the two partnerships could not validly agree to a 20-cents-per-gallon surcharge payment factor as a partial payment for the use of tangible assets, rather than as a payment (in whole or in part) for the right to use Plaintiff's franchise. Nor does Defendant contend that, if the parties actually did reach such an agreement, tax consequences adverse to Plaintiff would follow. Defendant's position is, rather, that the entire 20-cents-per-gallon surcharge payment factor was in fact intended to be, and was, a royalty (or rental) payment for the use of Plaintiff's franchise." [pp. 24–25]

It seems significant to this Court that Defendant does not dispute that the 20-cents-per-gallon payment, combined with the other rental payments, is still not as high a rental payment as "unrelated" parties might agree upon. Yet, Defendant contends that the 20-cents-per-gallon payment must be a "royalty" because of a "label". Neither does Defendant dispute that the parties could avoid the "royalty" problem altogether by simply executing another agreement.

While, as stated above, Taxpayer's expert witnesses all agreed that a Coca-Cola franchise per se had no value, the Defendant's expert witnesses were not nearly so unanimous in their opinions. Mr. George Overend, who testified as one of the Defendant's experts, testified that there is no good will or going-concern value in a Coca-Cola Bottling Company and that, in his opinion, all of the fair market value of the consolidated entities not attributable to tangible assets was assignable to franchise (R. 1274–1275; Finding 34, n. 43, p. 53). It follows that, if all of the value of the rent is fair market value for use of tangible property, no rent remains for assignment to franchise. However, another one of Defendant's expert witnesses, Mr. James Wimberley, an employee of the Coca-Cola Company for 36 years, testified that the mere holding of a franchise to bottle and sell Coca-Cola does not assure profit; that many bottlers who held a Coca-Cola franchise from 1965–1969 were either operating marginally or were going under financially; that, in his opinion, management was the largest single factor in the successful operation of a Coca-Cola bottling enterprise; that both Mr. El-

more and Mr. Brightwell (managers of the Taxpayer) were recognized in the Coca-Cola industry as outstanding managers; and that he knew of no standard "rule of thumb" for determining the value of a Coca-Cola franchise and did not believe that there was any such standard "rule" (R. 703–750). Therefore, it is the opinion of this Court that much of the Defendant's expert witness testimony is conflicting, ambiguous and confusing. Indeed, Trial Judge Wood found that "the weight of the credible evidence is that the value of a Coca-Cola franchise, in and of itself, cannot be determined by any standard measurement technique, and that such a franchise, again in and of itself, has no fixed, determinable, monetary value" [Finding 34(f)]. This Court agrees.

One other area of dispute which concerns this Court was pointed out by the panel of the Court of Claims, with which this Court disagrees completely. The opinion of the majority of the panel stated:

"The unreasonableness of Plaintiff's position is further accentuated by the testimony of experts, from both parties, showing that royalties in other sub-bottlers contracts ranged from five cents to thirty cents per gallon. Plaintiff's expert narrowed this range to ten to twenty cents and the Government's expert, a man with extensive experience in Coca-Cola operations in the southeastern part of the United States, testified the majority of the contracts located in the southeastern United States were in the fifteen to twenty-five cents range. This latter figure is consistent with an exhibit of Plaintiff's, a 'memorandum of proposed plans of reorganization of Bellingrath interests'. This memorandum was attached to a letter sent by Ernst and Ernst to Elmore which states the 'customary rate is twenty-five cents a gallon'." [Court of Claims at 1331].

Apparently, the majority of the panel in the Court of Claims followed the reasoning that, due to the fact that some sub-bottler contracts in the southeastern United States did show franchise payments ranging from five cents to thirty cents per gallon, the Taxpayer's 20-cents-per-gallon payment must, therefore, be a franchise or royalty payment. However, the testimony of experts from both parties to which the Court of Claims panel apparently refers clearly distinguishes the instant business arrangement of Taxpayer from these other sub-bottler arrangements to which the panel refers. This testimony is best summed up by the testimony of Mr. Peters, one of Taxpayer's experts. Mr. Peters testified that the instant arrangement whereby Taxpayer leased real estate, equipment, etc., to a partnership sub-bottler was unique in the soft drink bottling industry as far as he knew [R. 638]; that, as a rule, the majority of Coca-Cola bottlers in America are so-called first-line bottlers and, thus, a sub-bottler is an exception to that rule; and that, "I am familiar with sub-franchisers that are in a fixed amount of dollars on ten cents per gallon, on twenty cents per gallon and twenty-five cents per gallon. I have heard of possibly one thirty-cent arrangement, and I have heard of arrangements where there was no amount involved, but the majority of those that I am familiar with were in the ten-cent range or twenty-cent range, but *there were no assets involved, and they were third-party type arrangements. * * * [T]hey were not arrangements like this where they were dealing with the same owners where the stockholders of the corporation were the partners. That is why I am convinced this is a rental arrangement"* [R. 643, 644]. The testimony in this cause clearly shows that the sub-franchise agreements to which the Court of Claims refers as being proof that this is a royalty payment are clearly distinguishable from the instant arrangement. As Mr. Peters pointed out, instant sub-bottler contracts were executed in the early part of the century when many first-line franchise holders did not have adequate transportation (due to lack of highways, automobiles, etc.) and, thus, a bottler would be unable to handle all of his territory. As a consequence, he would contract with an individual in the outlying towns and areas of his territory to let them have a sub-bottler contract if they would manufacture

and market Coca-Cola in that portion of the first-line bottler's territory that he was unable to get to. Mr. Peters stated that many of these early sub-bottlers contracts were not in perpetuity and that many were for short periods of time [R. 638–642]. Thus, the above-mentioned arrangements are clearly distinguishable from the Taxpayer's business arrangement which is the subject of these actions. The evidence in these cases clearly show that Taxpayer's arrangement was designed so that the Taxpayer-Corporation could hold property in perpetuity and to generate enough income through rental so that adequate assets used in the Coca-Cola bottling and selling business could be supplied by the corporation and leased to the partnerships. There is certainly nothing wrong with the Taxpayer's organizing its business affairs in order to minimize its tax burden. Nothing in the personal holding company provision demands that Taxpayer must necessarily receive royalty payments if it did not wish to receive them and the partnerships did not wish to pay them, and Defendant does not dispute this. Taxpayer has every right to mold its arrangements so that it did not obtain any royalty payments and, thus, avoid the personal holding company statutory provision since the rentals were not merely a facade.

It affirmatively appears to this Court from the preponderance of the evidence that Plaintiff-Taxpayer was not organized to shelter non-business passive income which 26 U.S.C. §§ 551, *et seq.,* was intended to guard against and impose a penalty upon. Rather, it affirmatively appears to this Court from the preponderance of the evidence that Plaintiffs, Dothan Coca-Cola Bottling Company, Inc., a corporation, and Montgomery Coca-Cola Bottling Company, Inc., a corporation, were organized to protect and preserve the Coca-Cola bottling rights of Mr. W.A. Bellingrath in perpetuity; to assure continuity of ownership by the Bellingrath Family; to hold assets (land, buildings, equipment, etc.) used in the bottling business; to lease said assets to the partnerships who engaged in the actual physical bottling process; and to use the

rental payments under said leases to acquire additional equipment in a continuing modernization plan.

Accordingly, the above premises considered, it is the opinion of this Court, and this Court so finds, that the amounts payable to Taxpayer by the Montgomery and Andalusia partnerships pursuant to the terms of the October 1, 1958, lease agreements, as amended, including the 20-cents-per-gallon surcharge payment factor included in the term "sub-bottlers contracts" incorporated by reference in said lease agreements, during the tax years here relevant, were intended to be, and were, rent for the use by the two partnerships of Taxpayer's tangible assets, not payment of rent or a royalty by the partnerships to Taxpayer for the use of Taxpayer's franchise. Thus, Taxpayer is not a personal holding company and is not subject to the penalty tax provisions of 26 U.S.C. § 541.

Having reached the above-stated decision on the 20-cents-per-gallon payment factor, this Court finds it unnecessary to address the joint venture issue. In addition, said decision makes it unnecessary to decide the valuation issue.

Judgment will be entered in accordance with this Memorandum Opinion.